ELLA BENNETT, Respondent, v. THE PUNTON SANITARIUM ASSOCIATION, a Corporation, Appellant.

In the Kansas City Court of Appeals, March 5, 1923.

1. **NEGLIGENCE: Hospitals: Insane Patient: In Order for Plaintiff to Recover for Negligent Killing of Husband While Escaping from Hospital While Insane, It Was Necessary for Her to Show That He Was Insane When He Attempted to Escape, That He Escaped by Reason of His Insanity and That Defendant Had Knowledge of His Insane Condition.** In an action for the negligent killing of plaintiff's husband as the result of a fall from a fourth story window of defendant's sanitarium while attempting to escape therefrom while confined therein as an insane patient, *held* in order for plaintiff to recover it was necessary for plaintiff to show that deceased was insane when he attempted to escape, that he escaped by reason of his insanity, and that defendant had knowledge of his insane condition.

2. **EVIDENCE: Witnesses: Where Plaintiff Placed Certain Medical Witnesses, Who Were in Defendant's Employ, upon the Stand, and the Evidence of the Witnesses Was Not Uncontradicted, Plaintiff Was Not Conclusively bound by Their Testimony.** In an action for negligent killing of plaintiff's husband, caused by falling from fourth story window of defendant's hospital, while attempting to escape therefrom while confined therein as an insane patient, where plaintiff put upon the stand certain medical witnesses employed by defendant who stated that deceased was perfectly rational at the time he escaped and was not insane, *held* that as their evidence upon this point was not uncontradicted, and although plaintiff placed said witnesses upon the stand, she was not conclusively bound by their testimony.

3. **NEGLIGENCE**: Hospitals: Insane Patient: Evidence Held to Show That Decedent Was Insane When Killed by Fall in Attempting to Escape from Sanitarium, That He Escaped by Reason of His Insanity and That Defendant Knew of His Condition. In an action by wife for negligent killing of her husband as result of a fall from fourth story window of defendant's sanitarium while attempting to escape therefrom while confined therein as an insane patient, evidence *held* to show that deceased was insane at the time he escaped, that he escaped by reason of his insanity, and that defendant knew of the condition.

4. ———: ———: ———: Evidence: Whether Decedent, an Insane Patient in Defendant's Sanitarium, Was Given Usual Care and Attention Given to Such Patients by Ordinary Institutions of Similar Character, Held Not a Matter for Expert Testimony. In an action for negligent killing of plaintiff's husband as a result of a fall from fourth story window of defendant's sanitarium while attempting to escape therefrom while confined therein as an insane patient, it was competent for the jury as laymen to determine whether deceased was given the usual care and attention given to such patients by ordinary institutions of similar character, the question not necessarily being a technical one, the plaintiff was not required to produce expert testimony on the subject.

5. ———: ———: ———: Care: Duty: Duty of Sanitarium, as a Matter of Law, to Safeguard Insane Patients from Danger Due to Their Mental Incapacty to Care for Themselves. It was the duty of the defendant, sanitarium, as a matter of law, to safeguard deceased from danger due to his mental incapacity to care for himself.

6. ———: ———: ———: Death: Cause of Death of Insane Person, Under Evidence Held Not Left to Mere Speculation, But Was a Question for the Jury. In a wife's action for negligent killing of her husband caused by fall from fourth story window of defendant's sanitarium, while attempting to escape therefrom while confined therein as an insane patient, where the defendant contended that his death was not the result of the fall from the window, but to the same causes and disease that produced his insanity, the failure of plaintiff to produce any medical testimony covering deceased's condition during the last year and ten months of his life, *held* plaintiff should not be precluded, as a matter of law, from recoveriug, as there was other evidence tending to show that the injury received by deceased in the fall caused his death and the cause thereof was not left to mere speculation.

Bennett v. The Punton Sanitarium Assn.

7. **EVIDENCE: Hypothetical Question: Under the Evidence Hypothetical Question as to Cause of Death Held Not Erroneous in That It Failed to Give Any Medical History of Decedent During Latter Part of his Life.** In an action to recover for negligent killing of plaintiff's husband, an insane patient in sanitarium of defendant, as result of fall while attempting to escape therefrom, where it was claimed by defendant that his death was not caused by the fall, but to same causes and disease that produced his insanity, it could not be said, as a matter of law, that it was error to permit a physician to answer a hypothetical question that failed to give any medical history of the patient during the latter part of his life.

8. **———: ———: Where There Was a Question as to Direct cause of Death, Hypothetical Question Failing to Include Full Medical History of Patient, Held Properly Excluded.** In a case where there is a lack of medical history of the patient, and where his death it is claimed was not due to a negligent fall when attempting to escape from defendant's sanitarium while confined therein as an insane patient, but to a complication of disorders which produced deceased's insanity, it was not error to exclude a hypothetical question which did not contain all of the pertinent medical history of the patient's condition prior to his fall, the symptoms of which were to some extent the same after as before the fall.

9. **LIMITATIONS OF ACTIONS: Pleading: Amendment of Petition Filed After Statutory Period, Held Not to State a New Cause of Action, Barred by Statute of Limitations.** In an action to recover damages for negligent killing of plaintiff's husband as result of a fall from window of a sanitarium in which he had been confined as an insane patient, where the original petition, filed within the statutory period, charged that the injury caused deceased to become so weak that he could not withstand the effect of an operation to relieve the condition of certain organs causing deceased's mental condition, and that after the fall deceased became a helpless invalid and finally died as a result of lack of care given him, an amendment of the petition filed more than five years after death of deceased, alleging that deceased died from the effects of the injury received by the fall, did not state a new cause of action, barred by the Statute of Limitations, as both petitions were based upon lack of care of deceased by defendant.

Appeal from the Circuit Court of Jackson County.— *Hon. Nelson E. Johnson, Judge.*

REVERSED AND REMANDED.

*William L. Eagleton* and *Blackman & Bundschu* for respondent.

*Harkless & Histed* and *Hogsett & Boyle* for appellant.

BLAND, J.—This is an action brought for the negligent killing of plaintiff's husband. There was a verdict and judgment in favor of plaintiff in the sum of $5,000 and defendant has appealed.

The deceased was a practicing dentist at Sulphur, Oklahoma, and in February or March, 1911, an illness had come upon him which was diagnosed as low grade typhoid fever. On account of deceased's refusal to properly care for himself his illness resulted in a form of insanity which was manifested mainly in habits of wandering, he would get up from his sleep in the middle of the night and wander about the town. Finally he was arrested for insanity and brought before a lunacy board but was released on the promise of plaintiff to take him away. She then brought him to Ray County, Missouri, where she had relatives, among whom was a brother, Dr. G. W. Smith. Deceased continued to practice dentistry until he left Oklahoma and was apparently a strong man physically except that he had lost flesh and had trouble in the retention and wasting of his urine and severe pains in his bowels. He was brought to Ray County in March, 1912. Apparently his mental condition became worse. He would circulate road petitions and wanted to build drainage dikes; he believed that he had complete control over the Irish; he wandered over the country leading a dog which he walked almost to death; he tried to trade the dog for a team of horses or mules. One day he was seen in town without his shoes and although the day was not cold he had on his overcoat. It does not appear that he was under any restraint but his relatives in view of his mental condition thought it was better to put him in a sanitarium,

and this was done on June 26, 1912, when deceased was brought to Kansas City by Dr. Smith and a Mr. Oliphant and placed in defendant's sanitarium.

Deceased did not want to go to the sanitarium and when taken there he was left outside with Mr. Oliphant while Dr. Smith went in and made arrangements for his care. He thereupon escaped from Mr. Oliphant although the latter attempted to overpower him. Dr. Smith and Mr. Oliphant located him the next day on the streets of Kansas City and enticed him back to the sanitarium. They got him inside when he again attempted to escape but was overpowered. Dr. Robinson, defendant's superintendent, participated in holding him at this time. Dr. Smith arranged with defendant for the care of deceased and gave the superintendent a complete history of the deceased's ailment and told the superintendent that deceased had become uncontrollable. He warned Dr. Robinson that they could not hold him unless they were fixed for that purpose. Dr. Robinson assured Dr. Smith that they had things arranged to hold him and that they would hold him; that they had a night watch and a day watch and there would be no danger of deceased's making his escape.

However, about 4:00 A. M. of August 7, 1912, deceased attempted his escape. Between the time he was placed in the sanitarium and the time of his escape he showed a disposition to fight. Dr. Robinson testified that deceased did not want to stay and did not want to comply with the rules; that deceased objected to things the nurse told him to do and when the nurse insisted on his obeying he would become violent; that he was "resistant;" that he was a great boaster and boasted about his strength and mentality. Deceased had spells of anger in which he would assault and threaten the man nurse and on one occasion he had on two suits of clothes and when the nurse asked him to take them off he became very angry about it. However, between these spells, which came on suddenly, he was rational and

talked in a rational manner. On the 2nd of August the superintendent wrote Dr. Smith that deceased "had one little spell during the past week in which he felt it was his duty to whip someone but he soon quieted down and has been peaceable since;" that "it is only when he has his spells that he talks irrationally." Defendant wrote that deceased was improving and that they had hopes that he would recover his health. His condition was described as secondary dementia.

Plaintiff visited her husband on the 3rd of July and deceased talked irrationally then. She had a conversation with the physician in charge and she told him that deceased had said that "he was going to get out if I didn't take him out," and she asked the doctor, "Is there any chance?" and "he threw back his head and laughed and said it was impossible, that they would take care of Dr. Bennett (the deceased)." Dr. Smith testified that he saw deceased five or six days after he took him to the sanitarium and at that time his mental condition was not improved; at first it seemed to be somewhat aggravated and deceased wanted to make his escape. He told the superintendent of this. Dr. Smith testified that at that time deceased was insane; that he was very weak; that thereafter there was very little improvement in his mental condition; that he saw him five or six days before he attempted to escape; that his mind was not much improved then; that at that time he told Dr. Robinson, the superintendent, that deceased wanted to get away and come down town. He saw deceased the day after he attempted to escape and at that time he was insane.

The evidence shows that defendant's sanitarium was a four story brick building and deceased had been confined to the third floor; but about ten days before his attempted escape, at deceased's request he was permitted to sleep on the fourth floor where only two or three other patients were. The windows on the third and fourth floors were covered with heavy wire screen-

ing, the wires being about the size of a lead pencil and were fitted into an iron frame. The frames were bolted to the window casings with hinges and locked on the outside. The doors leading from the third floor, except the one to the fourth floor, were kept locked at all times and there was no door leading from the fourth floor except the one to the third. Deceased slept in a large room on the fourth floor. There was a bath room on the fourth floor to which all the patients on that floor had free access. Late in the night of August 7, 1912, an attendant found deceased on the ground below the bath room window. He had made an improvised rope out of sheets with which he had descended. The window and wire screening were unlocked and open. There was evidence that the lower end of the rope was as much as twelve or fourteen feet from the ground. Deceased stated that he had got a key and opened the lock of the window but the evidence shows that no key was missing. He said that when he started down the rope he felt the knots slipping and that he was afraid to stop himself suddenly when he came to a knot for fear the rope would break, so he just slipped on down and alighted on his feet and then sat down on the ground.

Dr. Robinson told Dr. Smith that deceased had not put his weight on the sheets "to amount to anything" as the knots were not pulled tight and that deceased had fallen a considerable distance and evidently from the nature of the injury he had been unable to avert the fall hardly at all by the use of the sheets; that the rope slipped through his hands so quickly that he was never able to catch himself after he started; that deceased had fallen to the cement walk below and onto an iron cap that connected the sewer pipe; that this cap being under him, he struck on his feet and sat down upon the pipe. As a result of his fall deceased received a dislocation of the third and fourth lumbar vertebrae of his spine, the third lumbar vertebra was out of place and had slipped over the one above about one-fourth of an inch. This dislo-

213 M. A.—24

cation was reduced somewhat. Deceased became paralyzed in the lower extremities. There was paralysis of the bladder resulting in inability to pass his urine so he had to be catheterized to remove the urine from the bladder. At no time was this necessary before the fall. The displacement of the vertebrae was the cause of the paralysis of the bladder and lower muscles. The reflexes of his knee were absent. He had no control over his bowels.

The evidence shows that it was customary for defendant to have a nurse in attendance but that the nurse was on the fourth floor only a part of the time. Dr. Robinson could not say whether the nurse was on that floor the night of the attempted escape. Evidently there was no night nurse, at least, for quite a period of time prior to deceased's escape, for he could not have made the preparation that he did without discovery if a nurse had been in attendance. There was testimony that deceased appeared to be in good bodily health prior to his fall but after the same he steadily declined in health, although his mental condition did not get any worse. He was removed from the sanitarium on January 15, 1913, to the Wesley Hospital in Kansas City where he remained four days. He was then taken to the railroad station on a stretcher and thence to Sulphur, Oklahoma. After he arrived in Oklahoma he was put to bed and remained there two months. He died on November 8, 1914. From the time he arrived in Oklahoma until his death he had no control over his bowels and his bladder had to be constantly catheterized. He walked some around the house and yard, staggering around and bracing himself with one foot.

Deceased became ill in March or February, 1911, and had been complaining of "terrible attacks of pain in the lower part of the abdominal region;" he was having trouble with his urine at intervals which would be constantly wasting and at other times he would be unable to pass it. He would get better from time to time but

the condition would not entirely leave him. This condition of his bladder continued up until he went to the sanitarium but he appeared to have no bowel trouble at that time. Dr. Smith examined deceased just prior to his admittance into the sanitarium. He testified that at that time deceased had no organic or pathological trouble except the mental but that he was emaciated; that he was strong and had no bladder trouble; that the bladder trouble described was purely functional.

Five physicians waited upon the deceased from the time he returned to Oklahoma until his death but none of these were present at the trial nor did plaintiff introduce the testimony of any of them. However, defendant introduced the testimony of Drs. Sullivan and Mickle who attended the deceased after he went back to Oklahoma. Dr. Sullivan also waited on the deceased prior to his leaving Oklahoma. Dr. Sullivan testified that when deceased returned his urine would not pass; that he examined him and that he found no external evidence of any trouble; that deceased's prostate gland was not diseased; that the deceased was insane; that the gland that controls the opening and closing of the mouth of the bladder was paralyzed; that he would have involuntary movements of the bowels and that he was mentally unbalanced; that his mind was wandering but he was never violent; *that his condition was caused by his mental disease;* that it could have been caused by gonorrhea, syphilis or meningitis; that he did not have the last one and he did not examine him for the others. Dr. Mickle testified to the same trouble as testified to by Dr. Sullivan and that deceased had *"a general paralysis of the insane;"* that he had paresis; *that the disease that had caused the insanity had produced the paralysis;* that his speech was affected as were his hands, kidneys, tongue and whole body.

The suit was brought against the present defendant, the superintendent, doctors and persons connected with the defendant but at the conclusion of the evidence it was dismissed as to all but the sanitarium.

Defendant first insists that its demurrer to the evidence should have been sustained, that there was no proof of negligence on its part. Plaintiff was not in possession of the facts surrounding the attempted escape of the deceased and, therefore, put upon the stand Dr. Robinson and another doctor employed by the defendant. These witnesses stated that deceased was perfectly rational at the time he escaped and was not insane. Defendant insists that this testimony is uncontradicted and that plaintiff is bound by it. Of course, in order for plaintiff to recover it was necessary for her to show that deceased was insane when he attempted to escape, that he escaped by reason of his insanity and that the defendant had knowledge of his insane condition. [Phillips v. Railroad, 211 Mo. 419; Davis v. Springfield Hospital, 196 S. W. 104; Breeze v. Railroad, 264 Mo. 258.] We do not think that the evidence of these witnesses remains uncontradicted upon this point and although plaintiff placed them upon the stand she is not conclusively bound by their testimony. [Black v. Epstein, 221 Mo. 286.]

There was ample evidence tending to show that deceased was insane at the time he escaped, that he escaped by reason of his insanity, and that defendant knew of the conditions. The evidence shows an unbalanced mental condition of deceased prior to his entry into the sanitarium and shows that while in the sanitarium before his escape he manifested peculiar traits indicating an abnormal condition of mind. One of defendant's physicians testified that "insanity is a deviation from normal to such an extent that the patient is unable to react to his surroundings in a normal manner." The mere fact that deceased attempted to escape might not alone be strong evidence of his insanity for many perfectly sound-minded persons who have been deprived of their liberty by confinement have attempted to escape. But the manner in which deceased attempted to escape, especially in making a rope with knots that would not hold and extending only to within fourteen feet of the ground and over a cement

Bennett v. The Punton Sanitarium Assn.

sidewalk and then going down the rope in the way he did, that is, without making an effort to break his fall by using the rope to any extent or putting much weight upon it, together with the other facts tends to show an unbalanced condition of mind at the time. Dr. Smith testified that deceased was insane a few days before the escape and on the day following. It will be borne in mind that deceased was not irrational at all times, and plaintiff having the burden of proof it was necessary for her to show that he was irrational at the time he escaped and made his escape by reason of such condition. The facts set out above, together with the fact that deceased was confined on account of his insanity and that he was undergoing periods of irrationality which came on suddenly during the time of his confinement until shortly before his attempted escape, and that Dr. Smith testified that he was insane the day following his escape, is certainly sufficient evidence for the jury to say that he was insane at the time of his escape, although defendant's physicians testified that he was not. Of course, there was ample evidence that defendant had been warned and knew that deceased was likely to attempt to escape. In fact, defendant's superintendent testified that deceased did not want to stay.

It is urged in defendant's brief that defendant did everything it could to prevent deceased's escape and that it was not its duty to provide a special nurse for deceased and that plaintiff did not provide one; that the grating over the window was locked and well secured. It is suggested that deceased must have picked the lock. Defendant's agents assured Dr. Smith and plaintiff when they warned defendant that deceased would attempt to escape that it was prepared to take care of the deceased and to prevent his escape. No suggestion was made that a special nurse was necessary. Defendant provided a nurse for the fourth floor but apparently he was absent for some time prior to deceased's going out of the bath room window. There is no evidence that deceased picked

the lock or that he knew anything about picking locks, and the jury could infer, although there was testimony that the grating was locked and the keys were in the possession of the nurse, that deceased escaped by reason of some insecurity in the lock or that the grating was not properly locked or not locked at all.

It is further insisted that this case involves the proper care and treatment of an insane person by a physician and that plaintiff failed to introduce any evidence tending to show that deceased was not given the usual care and attention given to such patients by ordinary institutions of similar character. We do not think that it was necessary for plaintiff to produce expert testimony on this subject. It was competent for the jury as laymen to determine this question, for the reason that it does not necessarily involve any technical matter. Dr. Smith testified as to deceased's insanity and it was competent for the jury as laymen to judge of deceased's insanity from the facts (Baldwin v. The State, 12 Mo. 223, 235, 236, 237, 238), and having found that deceased was insane and that defendant knew or might have known that he would attempt to escape, it was for the jury to say what would constitute ordinary care on the part of defendant in taking precaution to prevent deceased from escaping during an irrational period, which the evidence shows came on suddenly. Davis v. Springfield Hospital, supra; Breeze v. Railroad, supra.] It was the duty of the defendant as a matter of law to safeguard deceased from danger due to his mental incapacity to care for himself. [Davis v. Springfield Hospital, 204 Mo. App. 626; Robertson v. Charles B. Towns Hospital, 165 N. Y. Supp. 17; Hogan v. Hospital Co., 63 W. Va., 84; University of Louisville v. Hammock, 127 Ky. 564.]

Whether the specific acts of negligence pleaded in the petition were proved is not necessary for us to decide for the reason that we have found it necessary to reverse and remand the case on account of the asking

of an improper hypothetical medical question. Plaintiff will, no doubt, find it advisable before a retrial of this case to amend the petition in view of the fact that it is admitted that there is a variance, the dispute being as to whether it was a material one.

The hypothetical question complained of reads as follows:

"Doctor, assume a man of about the age of fifty-seven years, who in the summer of 1911 suffered some derangement of the mind, and who up until the 26th, about the 26th day of June, 1912, suffered from some trouble of the bladder which resulted in a retention of the urine for a period of one day, at times said person was unable to control his urine; that during 1911 and 1912 the patient suffered pains in the bladder; that thereafter he was able to control his urine, and on or about the 8th day of August, 1912, he received an injury which resulted in a displacement of the third or fourth lumbar vertebrae, that prior to the injury there was no impediment in his powers of locomotion, that after the injury he was confined to his bed and suffered a paralysis of the bladder and bowels and had numbness in the lower limbs; that from that time until his death some twenty-six months afterwards he had no control over either his bowels or his bladder; that there continued to be a constant wasting of flesh, and the patient was confined to his bed except at intervals he was able to sit up in a chair or to hobble about the house, what, in your opinion, doctor, could have been the cause of his death? Assuming these facts to be true, in your opinion as a physician could the injury to the vertebrae produce death?"

This question was propounded to Dr. Smith and he answered it in the affirmative. The question was objected to upon the following grounds:

"The question omits to state this man suffered constantly beginning in the fall of 1910 with severe pains in the lower part of his abdomen; that he suffered constantly during that entire period up to the time he was

taken to this sanitarium with the constant wasting of his urine, and a paralysis of the bladder at times which made it impossible for him to pass his urine; that he had some condition in his back which made it necessary for his wife to rub his spine from time to time.''

In reference to the admissibility of this hypothetical question the record shows deceased a physically strong man at the time he entered the sanitarium, which was only a few weeks before his fall, yet he was suffering from retention of his urine and inability to control it, the former symptom being the same as that after the fall although it appears to have been much worse after that event. He had also suffered from intense pain in his bowels, the cause of which is not explained. This trouble with the bowels had apparently left as he did not complain of it at the time he entered the sanitarium but it was of sufficiently recent date to be important in view of the bowel trouble following the fall. Dr. Smith testified that he had noticed that deceased had fallen off considerably in weight when he saw deceased after the latter came from Oklahoma. While there is no question but that deceased was a man of much strength at the time he went into the sanitarium, for the reason that there is ample testimony of this aside from the fact that it required a number of men to overpower him, yet the undisputed testimony shows that he suffered trouble in parts of his body that became paralyzed after his fall, to-wit, his bowels and bladder. The bladder trouble manifested itself in the incontinence and stoppage of the urine right up to the time he went to the sanitarium, which was only a short time before he fell. Dr. Smith did not dispute this but said deceased had no organic trouble when he went into the sanitarium. Therefore it will not do to say that deceased was a perfectly well man in body at the time he entered the sanitarium. Of course, plaintiff admits that deceased was suffering from a form of insanity. Defendant insists that this form was paresis which the evidence shows is caused by syph-

ilis. Dr. Smith gave tuberculosis as another cause. Paresis is what is commonly known as softening of the brain and the undisputed testimony shows that it results in paralysis and death and is incurable. However, Dr. Smith testified that deceased did not have softening of the brain, so we assume that he did not. However, it would seem that a person who is insane is not entirely well physically and there is evidence, undisputed, that deceased had become emaciated. Dr. Smith testified to this and plaintiff testified that deceased lost much weight after he became sick.

It is true that Dr. Smith frequently saw the deceased for six months after his injury and testified that his physical ailments were due from paralysis caused by the injury to the spinal column, which was received by deceased at the time he fell. At no time did Dr. Smith testify, from his knowledge as a physician of the facts, that the death could have been caused by the fall. Plaintiff introduced no medical testimony whatever covering a period of a year and ten months prior to deceased's death, tending to show his condition or the cause of his condition during that time. Dr. Smith did not see deceased again after the latter returned to Oklahoma.

Defendant produced two of deceased's principal physicians who attended him after his return to Oklahoma, and they testified that his death was due to his insanity and the disease that caused his insanity, and was not due to any other cause. It may be a subject of surprise that plaintiff did not produce any medical testimony covering such a length of time prior to deceased's death when he was treated by doctors, were it not for the fact that when defendant produced testimony of these two doctors, it was found to be against plaintiff.

The evidence of Dr. Mickle tends to show that not only deceased's lower extremities but his whole body was paralyzed. Dr. Smith did not testify that the injuries deceased received would cause any other form of paralysis than that which deceased suffered from at

the time Dr. Smith saw him, to-wit, to deceased's bowels, bladder and lower limbs. It would seem, then, that after deceased returned to Oklahoma the paralysis not only affected his bowels and bladder and lower limbs but extended to his entire body. Drs. Sullivan and Mickle testified that this was caused solely by deceased's mental derangement or the diseases that caused such derangement. Under the circumstances it is a serious question, but one we do not pass upon, whether the jury as laymen were not left to mere speculation as to the cause of death unless there is competent expert testimony tending to show such cause.

The evidence of plaintiff was that during the winter of 1910 and 1911 deceased "had been complaining of those terrible fits of pain in the lower part of the abdominal region." There is also undisputed testimony that frequently deceased was troubled with inability to pass his urine and that it would be retained for a period of one day after which time it would pass off. Plaintiff rubbed his spine when deceased came to Missouri but for what ailment is not shown. The hypothetical question apparently submits that deceased was troubled in the matter of retention of urine only on one occasion, while the evidence shows that this trouble covered quite a long period of time and continued up to the time the deceased entered the sanitarium.

The question was also objected to for the reason that there was no medical history of the deceased for so long a period prior to his death and it is now insisted that the instruction was improper for this reason. We are not prepared to say that it was incumbent upon plaintiff to produce the testimony of the physician or physicians who treated her husband after his return to the State of Oklahoma or to explain why such testimony was not produced by her. There is no doubt that this failure on her part raises an unfavorable inference against her which could have been properly brought to the attention of the jury. However, defendant has pointed us to no

case where there has been a refusal to permit a recovery under such circumstances or which has held that where such testimony is absent a hypothetical question, such as the one propounded in this case, cannot be asked. It is contended with great seriousness that expert testimony covering the medical history to the date of the death was necessary to prevent the cause of death being left to mere speculation, therefore, the necessary result of the contention is that plaintiff cannot recover without producing medical history of the last year and ten months of deceased's life. Of course, the testimony of these physicians if produced might have been very unfavorable to plaintiff as was the testimony of the two whom defendant produced, and we do not think that she should be precluded as a matter of law from recovering on this account if she has other evidence tending to show that the injury deceased received on August 7, 1912, caused his death and that the cause is not left to mere speculation.

Plaintiff calls our attention to the fact that at the time the hypothetical question was asked the testimony of Drs. Sullivan and Mickle had not been introduced in evidence. Plaintiff testified to the physical condition of her husband after he returned to Oklahoma, showing a general decline of his health and, aside from his mental condition, that his main symptoms were his bladder, which had to be catheterized to remove the urine, and lack of control of his bowels. In view of the facts we cannot say as a matter of law that a physician cannot answer or ought not to be allowed to answer a hypothetical question that fails to give any medical history of the patient for the length of time the evidence shows had elapsed between the return of deceased to Oklahoma and his death. However, in the light of this lack of medical history we think that it was particularly important that the hypohetical question contain all of the pertinent history of the patient prior to his fall, especially the trouble that he suffered in the organs that it was claimed were

afterwards paralyzed as the result of the fall and that caused his death. This, plaintiff did not do in the hypothetical question. Deceased suffered from a complication of disorders both before and after his injury, the symptoms of which were to some extent the same after as before and the hypothetical question should have included the full history. We think that it should have been excluded. [Hahn v. Hammerstein, 272 Mo. 248; Root v. K. C. So. Ry., 195 Mo. 348, 377.]

It is claimed that the cause of action alleged in the amended petition on which plaintiff went to trial was barred by the statute of limitations, said petition having been filed more than five years after the death occurred   The original petition was filed within the statutory period and although the second was not, the negligence charged in the second or amended petition was the same as in the first. The negligence charged in both petitions was based upon the lack of care of deceased by defendant; in the first petition it was charged that the injury was such as to cause the condition of the deceased to become so weak that he could not withstand the effect of an operation, which he could have undergone to relieve the condition of his bladder and prostate gland causing deceased's mental condition; and that after the fall deceased became a helpless invalid and finally died as a result of the lack of care given him. The petition was amended so as to allege not only the matters contained in the original petition but that deceased died from the effects of the injury received by the fall. It is quite apparent there is no new cause of action stated in the amended petition.

Complaint is made of plaintiff's instruction No. 1 which covered the entire case and directed a verdict for plaintiff. Numerous complaints are made of this instruction and it is apparent that it does not closely follow the petition in a great many respects and is very loosely drawn, the name of defendant in one place being substituted for plaintiff and at another place plaintiff for

deceased. Plaintiff claims that there is no material difference between the allegations of the petition and the instruction. It is hardly possible that plaintiff will not amend her petition and instruction on another trial as it is quite apparent that the objections made are most serious, so it is not necessary for us to go into them.

The judgment is reversed and the cause remanded. All concur.