EDWARD STALLMAN, Respondent, v. G. WILSE ROBINSON, M.D., G. WILSE ROBINSON, JR., M.D., LOUISE LOEWY, M.D., and ROBERT S. DARROW, M.D., Appellants, No. 43322—260 S. W. (2d) 743.

Division Two, September 14, 1953.

*J. M. Loomis* and *Omar E. Robinson* for appellants.

*Charles F. Lamkin, Jr.,* and *Bernard L. Trott* for respondent.

BARRETT, C.—The appellants, Dr. G. Wilse Robinson, Sr., Dr. G. Wilse Robinson, Jr., Dr. Louise Loewy and Dr. Robert S. Darrow, operate a private hospital or sanitarium and are specialists in the care and treatment of the mentally ill. The plaintiff's wife, Ruby Marie Stallman, entered the defendants' institution as a patient on the 6th day of March 1949 and four days later committed suicide by hanging or strangling herself with strips of cloth torn from her nightgowns and fastened to a water pipe in the bathroom. In this action against the appellants to recover damages for her negligent death the husband, Edward Stallman, has recovered a judgment for $9000. The appellants, owners and operators of the institution, appeal from the judgment and contend: (1) that the husband pleaded but failed to prove specific negligence, in fact "plaintiff's proof wholly failed to prove specific negligence of the defendants," (2) that he did not prove facts demonstrating liability or upon which a verdict and judgment could be based and (3) that the trial court erred in refusing to direct a verdict in their favor because his evidence failed to show that the defendants did not give his wife proper treatment, while their evidence conclusively showed that she was given watchful care and the most careful treatment. Essentially all these contentions are directed to one point and one argument, that the plaintiff has failed in his proof, or, that there was no evidence from which the jury could

find that the defendants or their employees were negligent and, therefore, liable in damages for Mrs. Stallman's death.

While the fundamental rules relating to malpractice may be generally applicable to this action, it is not, strictly speaking, a malpractice case. There is no claim or evidence of improper diagnosis and there is no claim or evidence that the appellants were negligent in their treatment of Mrs. Stallman's mental illness. The appellants, having accepted Mrs. Stallman as their patient, owed her the specific duty of exercising reasonable care to safeguard and protect her from injuring herself. Their duty in this regard was proportionate to her needs, that is, such reasonable care and attention as her known mental condition required. Annotation 11 A.L.R. (2) 751, 756, 778; Davis v. Springfield Hospital, 204 Mo. App. 626, 218 S. W. 696. Several factors have some bearing upon whether the appellants have discharged their specific duty but "The most important single factor in determining whether or not a hospital was negligent in failing to prevent the suicide of a patient is whether or not the hospital authorities under the circumstances could reasonably have anticipated that the patient might harm himself." Annotation 11 A.L.R. (2), l.c. 782. And, whether these determinative factors are present depends upon the detailed facts and circumstances of the particular case.

The following is the background of Mrs. Stallman's illness: She was twenty-eight years of age at the time of her death, was married to Edward in 1938, and they had one daughter, Caroline Sue, aged ten years at the time of this trial. They lived in Glasgow and Edward operated a filling station. Their home life was normal and happy and there was no noticeable indication of illness until February 13th, 1949, when Edward observed that Ruby Marie was unusually cross, sat shaking her head and crying, complaining that her neighbors and Edward did not like her. During the week she became worse, nervous and depressed, and on Wednesday went to a doctor in Fayette, alone. He gave her some sleeping tablets and she seemed to improve but during the next day or two she became further depressed. On Monday Edward came home in the afternoon just as she slashed her throat with a razor blade and was about to slash again. Her father and mother came from Kansas City and she was taken to a hospital in Fayette where her family was advised that she was mentally ill and should be taken to Dr. Robinson in Kansas City. After six days in the hospital she returned home and appeared to improve but soon became depressed again and was afraid to stay alone. Edward took her to Kansas City and they spent two days with her parents but she was dissatisfied and they returned to Glasgow with her young sister who stayed with her while Edward was at work. By Thursday, March 5th, she was much worse and Edward, the young sister, and the daughter took her to Kansas City to see Dr. Robinson. On the trip, at night, she was riding in the front seat with Edward and he was suddenly attracted by her

unusual movements and stopped the automobile to find that she·had taken a stocking off, tied it around her neck and was choking herself from beneath her coat. The next day her parents and Edward took her to the appellants' hospital.

The circumstances of her admission, the course of her stay in the hospital and the facts concerning her death four days later were these: Edward and his father-in-law were first interviewed by Dr. G. Wilse Robinson, Sr., on Thursday, March 5th, 1949, and Edward gave the doctor a full account of his wife's illness including the details concerning her two attempts at suicide. He expressed to Dr. Robinson his fear that his wife would again attempt to commit suicide and suggested possible methods she might employ but the doctor assured him that every precaution would be taken. The following morning, March 6th, Ruby Marie was admitted to the institution and Edward paid $150 for her first week's hospitalization. Dr. Darrow took her case history and, according to Edward, advised that her ideas of suicide could be dispelled in a short time but that it would take some weeks to improve her nervousness and delusions. She was assigned to a room on the third floor with another patient. All patients with suicidal ideas were admitted to that floor which was particularly equipped to care for such patients and the greater number of nurses and attendants were employed on that floor, twenty-five in staggered shifts for the twenty-five or thirty patients. Dr. Louise Loewy said that from the records and from the other doctors she was informed of Mrs. Stallman's suicidal ideas and so there can be no doubt but that the hospital was forewarned and should have anticipated that their patient might harm herself.

In Mrs. Stallman's newly decorated room there were two low couches around a corner table fixed to the wall. The windows ·in the room were barred and the clothes ▮ closets, where the patients' effects were kept, locked on closing and only nurses could unlock them. The door to the room was always kept open and the door to the bathroom was cut off at the bottom approximately two feet so that attendants walking in the hall could see into the bathroom. This room was a half bath consisting of a stool and a lavatory with a water pipe running down the corner of the room. In this room there was also·a chest of drawers. As to all the rooms on the third floor and their patients, according to the appellants, ''The nurses, nurses' aides, maids and all employees on the floor continually, specifically cautioned, and in going about their duties continuously watched the patients in these rooms,'' and on the day of Mrs. Stallman's suicide there were eleven people on duty on the third floor.

The doctors had not precisely diagnosed Mrs. Stallman's mental illness. Dr. Loewy said that she ''had·ideas of reference'' concerning her husband. Dr. Loewy tentatively concluded that Mrs. Stallman was either a manic-depressive or a schizophrenic with paranoid ideas. The

course of her treatment, other than interviews and observation, on the 6th, 7th, 8th and 9th of March is not known. On the morning of the 10th, according to the reports, she seemed to be more cheerful, more interested in the activities on the floor and not so depressed as formerly, an attitude patients sometimes feign to escape observation. On the morning of the 10th, between eight and ten o'clock, she was given a muscle relaxing drug, curare, and an electro-shock treatment and placed in a safety belt on her couch, asleep, with an attendant sitting at her side. According to the nurse who assisted in the treatment Mrs. Stallman had a normal reaction and recovery from the treatment. Neither the doctor nor the nurses engaged in giving the treatment saw her again until after her suicide in the afternoon. At two o'clock some of the nurses were changing their staggered shifts and one of the nurses coming on duty at that hour stated that she immediately went to Mrs. Stallman's room ''and she was in her safety belt, it was locked, and * * * (she was) apparently asleep, so I went on to the next room.'' While the defendants' evidence tends to show that nurses and attendants were constantly walking up and down the hall, looking into patients' rooms, no other witness than this one nurse at two o'clock saw Mrs. Stallman alive again. About two-thirty Dr. Loewy and a nurse were in a room across and down the hall a door or so and heard another patient say that someone should come in the room because Mrs. Stallman had fainted. Dr. Loewy and one or two nurses rushed to the room and found Mrs. Stallman with her feet sticking out from under the bathroom door into the bedroom, plainly visible from the hall. Her head was underneath the washbowl and there was a yellow and pink ''string'' around her neck which was tied to the water pipe. Dr. Loewy thought that she was still alive and artificial respiration was applied for a half hour and her death was reported at three o'clock.

In the briefly detailed circumstances whether the appellants breached their specific duty to reasonably safeguard and protect Mrs. Stallman from injuring herself and committing suicide was for the jury to say. Bennett v. Punton Sanitarium Ass'n., 213 Mo. App. 363, 249 S. W. 666; Smith v. Simpson, 221 Mo. App. 550, 288 S. W. 69; Davis v. Springfield Hospital, (Mo. App.) 196 S. W. 104; Davis v. Springfield Hospital, supra. The time element is not decisive, but it is a factor. In Smith v. Simpson, supra, the night nurse's report said, ''Mrs. Smith rested well and was in a very happy mood when she retired. Was up at 11:00 to the toilet. Said she could hardly wait for Friday to arrive —the day she was to go home; looked in the room at 2:30 and she was sleeping at 4:30 good; at 6:15 found her hanging by neck in corner of room.'' In view of the hospital's specific duty and despite the nurse's vigilance, in the detailed circumstances, it was held that the plaintiff had adduced substantial evidence in support of the charge that the ''defendants failed to use ordinary care to watch Mrs. Smith and thereby prevent her self-destruction by reason of her alleged

nervous and mental derangement." The presence of nurses and attendants is a factor but not necessarily determinative of fulfillment of duty. In Paulen v. Shinnick, 291 Mich. 288, 289 N. W. 162, the windows in a third floor room opened out and they were guarded by heavy screens which opened inward and were padlocked and only attendants carried keys. Several patients, in charge of a nurse, were sewing in the room and a patient complained of feeling faint, as she had formerly, and the nurse unlocked the screen and opened the window. The patient then said she had dropped her thimble and that it had rolled under the radiator. The nurse, instead of first locking the screen, leaned over to pick up the thimble and the patient leaped upon a radiator and jumped from the open window. In view of the patient's known mental illness and depression the court said, "Under these circumstances, it was a question of fact whether defendant's agent * * * acted with due prudence in leaving the window and screen unlocked even momentarily and even though she remained in the room." In this case there was no explanation for Ruby Marie's being in a safety belt at two o'clock in the afternoon. This belt was said to have been locked at two o'clock and only nurses carried keys to unlock them. People have been known to escape from safety belts, even to commit suicide while restrained by one, but there is no explanation here of how Mrs. Stallman escaped from this belt. A nurse saw her at two o'clock and there were six, eight or ten nurses and attendants constantly walking the floor and yet the fact is unexplained that no one saw her thereafter. After her death someone at the hospital gave Edward her personal effects and these included four yellow and pink nylon nightgowns and each of the gowns had the sewn belt-like strips from around the middle torn from the gowns. Patients customarily kept the clothes they wore but normally their extra clothes were placed in locked closets. Apart from the inferences to be drawn from the hospital marked gowns themselves and her possession of them are the inferences as to the length of time required to tear the strips from them, to conceal them, fashion the strips into a rope and finally to successfully employ such a rope as a noose.

The appellants' argument that the plaintiff failed to prove facts demonstrating liability is based upon the claim that the plaintiff offered no evidence as to what a proper guard should have been or what suitable restraints should have been employed, or that failure to employ either was the proximate cause of his wife's death. In this connection it is urged that the plaintiff failed to produce any expert testimony in proof of his claim of negligence, there was no proof that the defendants did not use the care and skill recognized as correct by the branch of the medical profession practiced by defendants and, finally, that there was no proof that plaintiff's wife was insane when she committed suicide. It is said in all these connections that the defendants'

evidence conclusively showed that they "accorded plaintiff's wife every care, treatment and duty imposed by law upon them."

As previously pointed out, this is not, strictly speaking, a malpractice case. There is neither claim nor proof of improper diagnosis or treatment, the "crux of the negligence charge is that defendants failed to use ordinary care to watch Mrs. Smith and thereby prevent her self-destruction by reason of her alleged nervous and mental derangement." Smith v. Simpson, supra. There was neither question nor issue in this case but that the appellants were indeed accomplished specialists, and the defendants' evidence tends to show that their institution was recognized and properly conducted. But "the care and skill recognized as correct by the branch of the profession in which they practiced in this community" has no bearing upon whether their specific obligation and duty to safeguard and protect Mrs. Stallman from self-destruction, in view of her known mental condition, was adequately discharged. In part the appellants' argument proceeds upon the theory that only the plaintiff's evidence may be looked to for proof of the facts and unfavorable inferences but, even in a true malpractice case, "plaintiff must be given the benefit, not only of all testimony that was adduced in his behalf, but also of any favorable testimony that may have been given by defendant's witnesses, in addition to which he must be allowed the benefit of reasonable inferences of fact on all the proof." Trask v. Dunnigan, (Mo. App.) 299 S. W. 116. And, as we have attempted to illustrate, upon the question of sufficiency of proof of negligence and ultimately of liability, there are unfavorable inferences to be drawn from the defendants' testimony, both expert and lay. In this connection, negligence and proximate cause in a malpractice case need not be established by direct and positive testimony "but may be shown by circumstantial evidence, inferences legitimately drawn from physical facts * * *." Eicholz v. Poe, (Mo.) 217 S. W. 282, 284; annotation 11 A.L.R. (2), l.c. 776. So it is with the question of whether Mrs. Stallman was insane when she committed suicide on the fifth day of her hospitalization. She was taken to the appellants and admitted to their institution because she was "mentally ill." The tentative diagnosis was either manic-depressive or schizophrenia with paranoid ideas. The jury had these facts before them and both her past and recent conduct "and it was competent for the jury as laymen to judge of deceased's insanity from the facts * * * and having found that deceased was insane and that defendant knew or might have known that he would attempt to escape, it was for the jury to say what would constitute ordinary care on the part of defendant in taking precaution to prevent deceased from escaping during an irrational period * * *." Bennett v. Punton Sanitarium Ass'n., 213 Mo. App., l.c. 374, 249 S. W., l.c. 670. In some malpractice cases expert testimony may be necessary to demonstrate or prove negligence (annotation 141 A.L.R. 5) but in a case of

this type where the question is whether the patient was reasonably safeguarded and protected, in the circumstances in view of her known condition, expert testimony is not essential. ''We do not think it was necessary for plaintiff to produce expert testimony on this subject. It was competent for the jury as laymen to determine this question, for the reason that it does not necessarily involve any technical matter.'' Bennett v. Punton Sanitarium Ass'n., supra. Or, as was pointedly said in the Michigan case, ''Determination of whether Miss Rose should have locked the screen before stopping to retrieve plaintiff's fallen thimble, or to have taken some other precaution to prevent plaintiff's escape, is not a question on which a jury requires the advice of trained psychiatrists.'' In short, the evidence and the reasonable inferences were sufficient to support the plaintiff's claim, if found and accepted by the jury, and the appellants were not entitled to a directed verdict for any of the reasons urged upon this appeal.

■ The appellants urge, if they are not entitled to a directed verdict, that they are entitled to a new trial for the reason that the trial court prejudicially erred in the admission of evidence in two particulars. It is first urged that the four torn nightgowns were unduly inflammatory and that the court erred in admitting them in evidence for the reasons that, preliminarily, they were not sufficiently identified (State v. Goddard, 146 Mo. 177, 184, 48 S. W. 82), and there was no proof as to how or when they were torn or that they were employed as the instruments of Mrs. Stallman's suicide. The appellants claimed that there were but two nightgowns, the yellow ones, their witnesses did not see or know of the pink gowns. Edward did not remember for certain who gave him the gowns, he thought it was either Dr. Darrow or the lady at the desk. He said that they were put in a suitcase at the hospital, and ''We was showed that they were tore up out there.'' They were in Edward's and her parents' possession from the time he received them until the date of the trial. All four of the gowns, admittedly, had the hospital's identifying tags fastened to the inside of the collars. The nurse who first saw Mrs. Stallman after she was found in the bathroom did not think the ■ two gowns she saw were torn as much as they now are. The gowns she saw were torn, however, and this same nurse did see the strips fastened together and they were both pink and yellow. In these circumstances the gowns were sufficiently identified and there were several reasonable inferences that the jury could appropriately draw from their presence, possession and condition, and the trial court did not prejudicially err in admitting them in evidence.

■ The second particular in which the appellants claim that the trial court erred was in permitting plaintiff's counsel, in the cross-examination of one of their expert witnesses, to read to the witness and to the jury an article from the *Kansas City Star* relating to Secretary Forrestal's death. The incident complained of and the reading of the

article came about in these circumstances: The crucial factor in the case was the appellants' vigilance in safeguarding their patient and the questions, particularly to all the appellants' witnesses, concerned what was done or could have been done to have prevented Mrs. Stallman's self-destruction. This witness, a doctor, had testified for the appellants and the gist of his testimony was that the appellants and their employees could not have done more to safeguard and protect their patient. At the outset of his cross-examination plaintiff's counsel asked this question, ''Doctor, it was your testimony that a special nurse would not prevent suicides in all cases?'' The doctor, in answering the question, said, ''Yes, sir; I firmly believe that, and I am sure we all realize that all the resources of the United States Government were exerted in behalf of James Forrestal, and still he jumped out of a hospital window.'' It developed that the doctor's information concerning Secretary Forrestal's case was obtained from the newspaper accounts, particularly from reading the *Kansas City Star*. Counsel produced the *Star's* account of Secretary Forrestal's death and in the article the doctor in charge of the Secretary's case took full responsibility for its unfortunate termination. In the article the doctor stated that Secretary Forrestal became his patient on April 2nd and ''Necessary security, screening and a continuous watch were immediately provided for the patient. * * * A continuous watch was maintained with the patient at all times, and one of two specially-trained residents was available in the next room during nights throughout the course of treatment.'' By May 2nd it was felt that the Secretary had improved and there was a ''lessening of restrictions,'' and ''privileges were gradually extended to the patient'' and on May 22nd, after the special nurses and attendants had been taken away, the Secretary jumped from a window. In the first place the doctor was not content with directly answering the question, but insisted upon fortifying his answer with this rather devastating volunteered information. The newspaper article was not admissible as evidence of the facts stated therein (Shields v. Kansas City Rys. Co., (Mo.) 264 S. W. 890) and it was not offered for that purpose. The article did refresh the doctor's memory and since it was the basis of his information demonstrated, as he was forced to admit, that he was mistaken. 4 Jones, Commentaries On Evidence, Sec. 1753, p. 3224. The cross-examination, to this extent, was impeaching. 58 Am. Jur., Sec. 676, p. 369. The trial court offered to give a proper instruction limiting and restricting the effect and purpose of the article but no such instruction was offered and there was no error in its admission in evidence.

The appellants also insist that they are entitled to a new trial for the reasons that the trial court prejudicially erred in giving and refusing instructions. The refused instructions, six in number, dealt with various phases of the appellants' position concerning physicians and the ''degree of care and skill recognized in Jackson County or

similar communities in the treatment of same or similar conditions, under the same or similar circumstances.'' The given instructions complained of hypothesized the facts and theory of the plaintiff's right to recover and the appellants' liability. It is said that these two instructions do not require the jury to find either that the defendants were negligent with respect to their duty or that the negligence hypothesized was the proximate cause of Mrs. Stallman's death. It is urged that the instructions are a direct comment on the evidence ''and amounts to almost a directed verdict on behalf of the plaintiff.'' It is also objected that ''all of this evidence spoken about in this instruction (two) was that of the defendants'' and that plaintiff offered no evidence as to the duties or degree of care required of doctors, particularly specialists, in the community. What we have said concerning the merits of the appeal inferentially disposes of these objections. Instructions peculiarly applicable to a true malpractice case (Hilton v. Mudd, (Mo. App.) 174 S. W. (2) 31; Rothschild v. Barck, 324 Mo. 1121, 26 S. W. (2) 760) are not appropriate in this action. Likewise the negligence cases relied upon by the respondent are in point only in so far as the general rules may apply. The two given instructions are substantially in the language of the instructions hypothesizing the plaintiff's right to recover in Davis v. Springfield Hospital, (Mo. App.) 196 S. W., l.c. 105-106, and the instructions there given on behalf of the defendant suggest the precise issues involved in cases of this type. In the absence of proffered modifying and limiting instructions, the given instructions sufficiently submit the negligence relied upon, as well as proximate cause (State ex rel. American School of Osteopathy v. Daues, 322 Mo. 991, 18 S. W. (2) 487), and the court did not prejudicially err in the giving and refusal of instructions.

Accordingly the judgment is affirmed. *Westhues* and *Bohling, CC.* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.