TORREY, Appellant, vs. RIVERSIDE SANITARIUM, Respondent.

*March 15—April 11, 1916.*

*Private sanitarium: Duty as to restraint of patients: Escape: Frightening other person: Liability: New trial: Newly discovered evidence.*

1. It is the duty of a private sanitarium and its employees at all times during the treatment of nervous and insane patients to use such means to restrain and guard them as would seem reasonably sufficient to an ordinarily prudent man under like circumstances to prevent them from escaping and injuring others; and for breach of that duty liability will arise, if such breach proximately causes injury to another.

2. No breach of the duty above stated was shown in this case, it appearing, among other things, that the patient in question never exhibited symptoms of violence; that he came to defendant's sanitarium (a private one) voluntarily and was apparently normal and entirely tractable; that, at the time of his escape, which

occurred while he was being transferred from a lower to an upper floor, there was a male attendant at his side; and that an attempt to place greater restrictions on his liberty might easily have resulted in exciting him and producing serious results.

3. A motion for a new trial on the ground of newly discovered evidence may properly be denied where such evidence would add nothing to the case.

APPEAL from a judgment of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Affirmed.*

Personal injuries. The following facts appeared on the trial: The defendant is a corporation maintaining a private sanitarium for the treatment of persons afflicted with nervous and mental diseases or drug habits in the village of East Milwaukee, the building being about three blocks from the house of the plaintiff. On November 16, 1913, the defendant received as an inmate one Ralph Kennan, a young man twenty-eight years of age, on the request of Dr. A. W. Gray, who was Kennan's medical adviser. During the forenoon of that day and prior to receiving the patient, Dr. Studley, the defendant's general superintendent, received information from Dr. Gray as to Kennan's general condition to the effect that he seemed to be in a confused state of mind, and had certain obsessions of a bodily character, principally to the effect that his heart was weak and that his stomach was going to fall out of the anterior abdominal wall. Dr. Gray further told Dr. Studley that these obsessions had existed for two days, that there had been no occasion to suspect mental aberration before that time, but that he wanted the patient under observation to determine whether his mental condition was a mere brain trouble or the result of some acute disease like typhoid fever coming on. During the afternoon of that day the patient voluntarily came to the institution accompanied by a male relative. He gave his own history to Dr. Studley, described the ideas which he had, and appeared to be normal and unusually intelligent. Dr. Studley made a physical and neurological examination of the patient and caused him to be

put to bed in a room in the so-called observation department, where the doors are not locked and where active mental cases are not kept, and gave directions as to his diet and as to hydrotherapeutic and massage treatments. Both day and night nurses, of which there were several in the department, were directed to converse with him frequently and report anything strange or peculiar which he said or did. On the 17th the patient seemed to the nurse to be perfectly normal in his conversation, cheerful, and gentle. Dr. Studley visited and talked with him several times that day. About midnight of that day he got up and dressed and left the institution without permission and without the knowledge of the night nurse, went down town to the city of Milwaukee, and returned at about 6 o'clock a. m. on the morning of the 18th. When Dr. Studley was informed of this at about 9 o'clock a. m. he visited the patient, who was in bed, and talked with him a time. No details of the midnight trip are given, but it does not appear that the patient's conduct or conversation was violent or abnormal during the trip or afterwards. Dr. Studley, after talking with the patient, determined to transfer him from his room on the ground floor to a department on the second floor called the men's hall, where the windows are guarded with screens so as to prevent escape. Dr. Studley told the patient that he wished to prevent any recurrence like that and that he desired to transfer him to another department, to which the patient assented without objection, and said "all right." He got out of bed, and with his underclothes on and a blanket thrown over him was conducted by a bath attendant from his room up a stairway toward the men's hall. He seemed to go with perfect willingness. Dr. Studley followed them along the corridor to the foot of the stairway and then proceeded towards his office. The patient and attendant walked side by side upstairs, and as they entered the large hall of the men's department into which the individual rooms opened the patient suddenly threw off the blanket, of which the attendant

had hold, ran down-stairs pursued by the attendant, dashed through the hall, into his former room, out of the window, and onto the ground.    Dr. Studley was still in the hall when Kennan ran down, but not at the foot of the stairs.    Kennan ran across the fields and came to the plaintiff's dwelling house, where the plaintiff was alone with two small children under three years of age, and demanded to use the telephone so he could telephone his uncle in Milwaukee.    He then asked for some clothes.    The plaintiff got him into a bedroom and told him he would find some of her husband's clothes there, and then took one of her children and ran for the front door of the house, where she met the attendant from whom Kennan had escaped and two female nurses in pursuit.    Kennan escaped from the house through a window and ran three or four more blocks, when he stopped and told the attendant he would go back, and was taken back to the institution.    On the following day Kennan was received into the Milwaukee hospital for the insane as a voluntary patient, where he remained until March 30, 1914, when he was discharged with his condition much improved.    There was testimony tending to show that as a result of the shock and fright the plaintiff was afflicted with neurasthenia and cystitis.

The jury returned the following special verdict:

"(1)  Did the defendant exercise ordinary care while transferring Ralph Kennan from room No. 2 to the men's hall? A. No.

"(2)  If you answer first question 'No,' then: Was such want of ordinary care the proximate cause of plaintiff's injury?    A. Yes.

"(3)  What sum will reasonably compensate the plaintiff for the injuries she received?    A. $1,000."

The trial court on motion changed the answer to the first question from "No" to "Yes" and to the second question from "Yes" to "No," and rendered judgment for defendant, from which plaintiff appeals.

*Charles E. Hammersley,* attorney, and *C. H. Van Alstine,*

of counsel, for the appellant, cited, among other cases, *Rich-ardson v. Dumas,* 106 Miss. 664, 64 South. 459; *Broz v. Omaha M. & G. H. Asso.* 96 Neb. 648, 148 N. W. 575; *Wetzel v. Omaha M. & G. H. Asso.* 96 Neb. 636, 148 N. W. 582; *Duncan v. St. Luke's Hospital,* 113 App. Div. 68, 98 N. Y. Supp. 867, affirmed in 192 N. Y. 580, 85 N. E. 1109; *University of Louisville v. Hammock,* 127 Ky. 564, 106 S. W. 219.

For the respondent there was a brief by *Schmitz, Wild & Gross,* and oral argument by *E. J. Gross.*

WINSLOW, C. J.    Doubtless it is incumbent on the defendant and its employees at all times during the treatment of nervous and insane patients to use such means to restrain and guard them as would seem reasonably sufficient to an ordinarily prudent man under like circumstances to prevent such an occurrence as took place here, and for breach of that duty liability will arise, if such breach proximately causes injury to another. *University of Louisville v. Hammock,* 127 Ky. 564, 106 S. W. 219.

The trial court held that the evidence would not justify a finding of breach of that duty in the present case, and we cannot say that this conclusion was wrong.

The evidence has been quite fully stated and will not be repeated.    It is to be remembered that the patient in question never exhibited symptoms of violence; that he came to the institution voluntarily and was apparently normal and entirely tractable; that at the time of his escape there was a male attendant at his side; that an attempt to place greater restrictions on his liberty might easily have resulted in exciting the patient and producing serious results; and further that the defendant is a private institution receiving voluntary patients and not a public institution receiving patients upon legal commitment.    There are probably no questions more delicate than the questions arising as to the proper care of such pa-

tients; humanity demands that they be treated and cared for somewhere, but it cannot demand omniscience in that treatment.    The same measures may produce the best results in some cases and the worst in others.    The evidence impresses us with the belief that the defendant's employees were performing an exceedingly difficult task with all the care and caution which ordinarily prudent persons in their situation would deem it necessary to exercise.

A motion for new trial on the ground of newly discovered evidence was properly overruled.    In our judgment the evidence referred to would have added nothing to the case against the defendant.

*By the Court.*—Judgment affirmed.