ALICE DICKINSON, Appellant, v. EDEN THEATRE COMPANY, Respondents, No. 41535—231 S. W. (2d) 609.

Division Two, July 10, 1950.

942

*Henry G. Morris* and *Charles E. Gray* for appellant.

*Moser, Marsalek, Carpenter, Cleary & Carter, W. E. Moser* and *J. C. Jaeckel* for respondent.

LEEDY, J.—This is an action for damages for personal injuries brought by Alice Dickinson against Eden Theatre Company, the owner and operator of "Fox Theater," a large moving picture show in the City of St. Louis. At the close of plaintiff's case, the court sustained defendant's motion for a directed verdict in its favor; judgment went accordingly, and plaintiff appealed. The sum claimed in the petition, $20,000, constitutes the "amount in dispute" within the meaning of § 3, Art. VI, Const. of Mo., 1945, and hence this court has jurisdiction of the appeal.

Plaintiff, a widow, 65 years of age, was injured on the night of October 10, 1947, as the result of a collision between herself and one Julius Dieckhorner, a newspaper vendor (whom she alleges to have been "an agent, servant, or concessioner" of defendant) in the outer lobby of the theater, while her daughter, Mrs. Carver, was engaged in purchasing tickets of admission.

Plaintiff's petition charged negligence on the part of defendant in the following particulars:

"(a) Although the defendant knew, or by the exercise of ordinary care should have known, that said Julius Dieckhorner was in the practice of running back and forth in said lobby, and mingled among and crossed in front of and behind patrons of said outer lobby of defendant's said theatre and that such running and walking back

and forth and the mingling and crossing in front of and behind patrons created a dangerous and hazardous condition; the defendant was negligent in causing or permitting said dangerous condition aforesaid to be and exist.

"(b) It was the duty of the defendant to exercise reasonable care, to maintain said theater, and particularly said lobby, in a safe condition, and to make reasonably frequent inspection to determine as to whether or not said theater and lobby were maintained in a safe condition, but defendant was negligent in permitting the dangerous condition aforesaid to be and exist.

"(c) Although defendant knew, or by the exercise of ordinary care should have known of the dangerous condition in and of said lobby, and of the danger to the plaintiff and other persons in said lobby by reason thereof, in time to have warned plaintiff and prevented her injuries, they negligently failed to do so."

It is unquestioned that plaintiff was an invitee, and lawfully upon defendant's premises at the time she was injured. Nor is there any dispute as to the applicable law. The proprietor of a place of public amusement is not an insurer of the safety of his patrons or invitees, the care required of him being "that which is reasonably adapted to the character of the exhibitions given, the amusements offered, the places to which patrons resort, and also, in some cases, the customary conduct of spectators of such exhibitions. It is a care commensurate with the particular conditions and circumstances involved in the given case." Berberet v. Electric Park Amusement Co., 319 Mo. 275, 3 S. W. 2d 1025, 1029, 61 A. L. R. 1269; Hudson v. Kansas City Baseball Club, 349 Mo. 1215, 1220, 164 S. W. 2d 318, 320; Hughes v. St. Louis Nat. League Baseball Club, 359 Mo. 993, 999, 224 S. W. 2d 989, 993-994. In the last mentioned case (transferred here after an opinion by the St. Louis Court of Appeals, 218 S. W. 2d 632), this court (in banc) reaffirmed the doctrine of the cases last above cited, and the proposition that "a paying patron of such a place [of public amusement] is not required to make a critical examination of the premises to determine their safety, but may assume that proper precautions have been taken for his safety by those in charge." Citing with approval Restatement of Torts, § 348, the Hughes case further declared that such proprietors "may not, without liability, permit activities of third persons, which are dangerous to patrons, to continue, after they know or by the exercise of reasonable care could have known of them, when by the exercise of reasonable care they could have been able to protect patrons therefrom by controlling or preventing such activities."

Plaintiff relies on, and particularly stresses the latter doctrine as governing her case under the facts adduced, so the question presented is simply whether there was evidence from which the jury could reasonably find that the defendant had failed in such duty. In

determining that question plaintiff's evidence is to be taken as true and considered in the light most favorable to her, including the benefit of favorable inferences arising therefrom.

Seven witnesses, including plaintiff, testified in her behalf. None of them (except plaintiff and her daughter, Mrs. Carver) were present at the time of the casualty, and Mrs. Carver did not witness it. Plaintiff's own knowledge of the circumstances surrounding her injury was very meager and fragmentary, as will presently appear. She and her daughter arrived at the theater about 8 P. M. The daughter got in the line out on the sidewalk to buy tickets, and plaintiff entered the outer lobby. She walked a distance of about 8 feet into the lobby and faced the man who takes the tickets. She was facing north and her back was to the south. She testified that she had been in that position about 10 minutes when the "man that sells papers ran into me and knocked me down and fell on top of me. ▉ * * * I was hurt so bad I don't know much about anything." She fell to the lobby floor and Dieckhorner fell on top of her. When she fell, her hat fell off and Dieckhorner had it on his arm after the collision. On cross-examination, she further testified as follows:

"Q. You didn't see the man before he struck you? A. Oh, no, sir.

"Q. You don't know what he was doing, in connection with striking you? A. Well, I don't. He just ran against me, knocked me down.

"Q. You never saw him before he struck you, did you? A. No.

"Q. Because you didn't see him, did you? A. I didn't see him from the back, no.

"Q. The first time that you saw him was after you had fallen down? A. After I fell down he fell on top of me.

"Q. I believe you say he fell on top of you? A. That's right."

There is no question about the fact that for several years prior to the time plaintiff was injured, Dieckhorner customarily stationed himself, about 8 o'clock each evening, in the outer lobby of the theater for the purpose of selling his papers—the night edition of the Globe-Democrat. During this time, and while so occupied, he was observed by several witnesses walking back and forth in various parts of the lobby "in and amongst patrons coming out of the theater." One witness said that "most of the time he used to stand right back of the ticket window * * * unless somebody wanted a paper or called to him," but that sometimes he would move through the crowd, and have some papers in his hand. Another witness, one who invariably bought a paper from him, was of the opinion that Dieckhorner was always at a different location. In fact, he did not remember of ever buying a paper from him from one certain location; sometimes he would be at the south end, other times at the north end, and still other times up by the door near the ticket window; sometimes he would have to look for him. This witness had noticed him "walk in front of people and back

of people," and had seen him "mingle in amongst the crowd, as many as 30 or 40 people * * * coming out of the theater," around 10 o'clock, when there was a break in the crowd. Another witness put it this way: "When the crowd of people comes out, he walks in between, mingles with the crowd, selling his papers." She had seen him, at such times, "cross in front of * * * and cut in behind" departing patrons. There was evidence that Dieckhorner stacked his papers on the floor of the lobby at the south wall, and also at the north wall, as well as behind the ticket office, from which stacks he would replenish his supply.

The evidence shows that the outer lobby was exceedingly well lighted, and that there were no screens or other obstructions therein. Dieckhorner, although present in the courtroom, did not testify. He was described as being an old, or elderly, heavy-set, man. One witness described his walk as being "sort of medium," but he was of the opinion that he did not walk "heavy-footed." Another witness said, "He has a shuffling walk—he doesn't seem sure-footed—he doesn't limp; he is not crippled so far as I have seen, but he is definitely flat-footed, I guess you would call it," but it seemed to him "that when the crowd is letting out, he moves as fast as he is physically capable of." Another witness said, "He drags his foot or shuffles it a bit." Still another said that Dieckhorner, "like a lot of men as they grow older, don't get along so good. He doesn't lift his feet high from the ground; he shoves one ahead of the other and gets along pretty well." He usually wore a cap, a short jacket of some kind, and a carpenter's apron. He also wore a money changer strapped around his waist, and it seemed to at least one witness that he wore glasses. Photographs subsequently taken in the outer lobby show him wearing glasses, and, in general, fitting the description above given. Defendant had knowledge of Dieckhorner's practice of vending his papers in its outer lobby, and its assistant manager so conceded, but insisted such use was merely without consent or objection on the part of defendant. In any event, there was no financial arrangement of any ██ kind between Dieckhorner and defendant. One witness stated he had seen newspaper vendors in the outer lobby of the Missouri, St. Louis and Loew's Theaters, and had noticed them on the sidewalk in front of other moving picture houses after the Globe-Democrat came out at night.

This same witness, John Friel, a 14-year-old school boy, further testified that one night ("in the summertime"—about two weeks before he heard of plaintiff's accident) as he was leaving the picture show just behind a young man about 21 years of age, he saw Dieckhorner in the outer lobby "walking over to get some papers on the north end; they bumped into each other." On cross-examination, the matter was further developed in this way:

"A. The old man started walking, was walking across the floor; the young man went almost right behind him, he was almost across the path of the young man and they just bumped shoulders.

"Q. They were walking—one was walking south, the other was walking east? A. No, the paper man was walking north, the other one was walking east.

"Q. The paper man was walking from south to north, the young man was walking east? A. Yes, sir.

"Q. And they bumped shoulders? A. Yes, sir.

"Q. You have seen a good many people bump shoulders in various crowds, haven't you? A. Yes, sir. * * *

"Q. Nobody fell to the floor or anything of that kind? A. No.

"Q. Just a little bump—it didn't make any impression on you at the time, did it? A.: No, sir."

Under the foregoing facts, it cannot be said that there was anything inherently dangerous in the customary conduct and activity of Dieckhorner in defendant's lobby, nor do we think that the one isolated instance where he bumped shoulders with the young man in the lobby would be sufficient to charge defendant with notice of the likelihood of injury to patrons or invitees resulting from his presence in the lobby under the facts outlined. "Negligence which imposes liability must result from a faulty or defective foresight. (Not hindsight.) * * * On what should have been anticipated, rather than what happened." The Hughes case, supra; McCollum v. Winnwood Amusement Co., 332 Mo. 779, 59 S. W. 2d 693, 696, 697; Nephler v. Woodward, 200 Mo. 179, 98 S. W. 488; Panke v. Shannon, 357 Mo. 1195, 212 S. W. 2d 792. The case rests upon its own peculiar facts (which are unlike any in the considerable number of cases cited by industrious counsel), in view of which we conclude the disposition made of it by the trial court was correct. Judgment affirmed. All concur.