Frank Edwin GREGORY, Appellant,

v.

Paul S. ROBINSON, Executor of the Estate of G. Wilse Robinson, M.D., G. Wilse Robinson, Jr., M.D., and Paul Hines, M.D., Respondents.

No. 47325.

Supreme Court of Missouri,

En Banc.

July 11, 1960.

Rehearing Denied Sept. 12, 1960.

Filbert Munoz and William C. Partin, Kansas City, for appellant.

William H. Sanders, and Caldwell, Blackwell, Oliver & Sanders, and Walter A. Raymond, Kansas City, for respondents.

EAGER, Judge.

This case was first submitted in Division, and an opinion adopted; upon a dissent the case was transferred to the Court in Banc. The suit is one for damages against two physicians and the executor of a third, as partners operating the Neurological Hospital in Kansas City for the care and treatment of mental and nervous diseases. Plaintiff escaped from the hospital on September 22, 1955, by jumping or dropping from a window, and was seriously injured. A jury returned a verdict for him in the sum of $40,000. The trial court set aside the verdict, entered judgment for defendants and in the alternative sustained defendants' motion for a new trial.

Plaintiff had been working at Bendix Aviation Corporation in Kansas City. He became depressed and worried, and was taken to a hospital about September 15, 1955; there he was seen by Dr. Harold Meyers, a consultant psychiatrist, who found him severely depressed and felt that he had a potential for suicide. Upon his recommendation plaintiff was admitted to the Neurological Hospital on September 18, 1955. Dr. Meyers talked to defendant Hines. Plaintiff was placed on the third floor where the acutely mentally ill patients were kept; the windows there were adequately protected; there were only two exits, one through a locked elevator door, the other through a locked stairway door. The patients were, however, allowed the freedom of the floor (or of the appropriate part of it), passing in and out of their rooms into the hallways, and using one or more lounging and recreation areas. The doctors and nurses circulated freely among them. It is conceded that the primary and accepted treatment for plaintiff's condition was electro-shock. Three of these treatments were administered, beginning soon after the time of his admittance. It is wholly unnecessary to describe here the mechanics of the treatment. Plaintiff had showed improvement, but was still somewhat "mixed up," and a cure had definitely not yet been effected. The doctors did not assume that his potential for suicide, generally present in depressed patients, was gone.

In the late afternoon of September 22, Dr. Hines was at the nurses' station on the third floor writing orders. He was the physician in charge at that time, with a tour of duty extending until 8:30 the next morning. Plaintiff then came to him, said that he was feeling a lot better and that he thought it was time for him to go home; he asked permission to call his wife and have her come for him. Dr. Hines testified: that he explained to plaintiff that he had not yet had enough treatment, that he should have more treatments and stay quite a while longer, and that he could not be permitted to use the phone; that plaintiff seemed a little unhappy at this, but that he walked on out, apparently without protest. The foregoing was offered as part of plaintiff's case, from the doctor's deposition. Plaintiff testified that Dr. Hines did not answer his "questions." When Dr. Hines completed his work there he went into the hall, intending to go to the second floor where his tour would be concluded. The elevator and stairway exits

were both protected by heavy, double doors; these doors had glass panes, but wire mesh was encased in the glass. One side of each door was fixed; the other could be unlocked with a key which the doctor carried, and thus opened. Inside the stairway door was a stair landing or entryway; from this the stairs led up to the left and down to the right; upon going down about ten or twelve steps there was another landing, between the third and second floors. On that landing there was a radiator against the wall, and above the radiator was a window. At this time the lower sash of this window was raised, with no screen on the window. Since the suit is not against the hospital, we are not concerned with the maintenance of the physical equipment.

Dr. Hines looked first for the elevator, but found that it was in use, as it often was at that time of day. He decided to use the stairs and proceeded to that doorway. Plaintiff's room was almost across the hallway from this door; it seems to be conceded that the hallway was nine feet wide. As Dr. Hines arrived at this door and turned toward it he looked in three directions,—to his right, to his left, and behind him. He saw patients to his right and left at the extreme ends of the ward, but none close by. He saw plaintiff sitting on his bed in his room, more or less behind him. It was the right side of the door that opened, as the doctor faced it. At this point we digress to say that plaintiff's counsel referred to a dictated record notation where the doctor had stated that he took "the usual quick glance" to see that no one was around, but the doctor testified that it was a thorough look and that what he meant was that he didn't stand and stare. Having looked, he unlocked the door, continuing to watch plaintiff. In the doctor's own words: " * * * and still I was looking in that direction, to see if he was going to do anything, and then I went quickly out of the door. I put my shoulder to it, with the idea of pushing it to, and just as I was in the process of turning to

look behind me I felt this terrific impact on the door, which pushed me aside and then Mr. Gregory went past me." The witness explained that he had thus watched plaintiff to see that he was not going to do anything, until he had started out the door; that there was an automatic closing device on the door, which ordinarily took a matter of seconds to close the door; that as he stepped through, he applied his shoulder to the door to close it, and that he was thus in the process of turning to look again when plaintiff bolted into the door. The impact was so sudden and so violent that it knocked the doctor aside and stunned him somewhat. He called into the hall for assistance, and then ran down the steps after plaintiff; however, plaintiff had leaped on the radiator, jumped or crawled through the window, and was in the act of dropping to the ground. The doctor saw his fingers holding momentarily to the sill, but was unable to reach him in time. Plaintiff suffered very serious injuries and no point is made here on the size of the verdict.

The expert testimony developed the following: that the modern concept of treatment in such cases is to allow patients as much freedom as possible, to treat them as individuals, and to try to "resocialize" them; that therein the physicians knowingly take a calculated risk; that better safeguards could be afforded by strict confinement, but that few patients would be cured; that there is a potential for suicide or for harming others in all acutely depressed mental cases, and that in some patients this may increase when they begin to improve, but certainly not in all; that patients such as plaintiff are being cured regularly by modern treatment; that care in entering and leaving such a ward becomes a sort of automatic reflex. And, specifically, it was shown here that it was a constant procedure for the doctors and attendants in this hospital to be careful on entering or leaving this ward. There was, and could be, no showing as to whether plaintiff's action was performed in an

attempt to escape or commit suicide. At the time of trial he had apparently recovered completely from his mental illness and he was working, though at a less remunerative position.

In plaintiff's principal instruction the negligence submitted was (1), that defendant Hines failed to make a reasonably careful inspection of the area before opening the door; and (2), that defendant "in passing through said door and in closing said door failed to exercise reasonable care to determine that no patients were then attempting to follow" him and escape. In ruling on defendants' after-trial motions and in granting judgment for defendants, the trial court obviously ruled that there was no substantial evidence to support either element of negligence thus submitted. In the alternative, the court granted defendants a new trial for errors in two of plaintiff's instructions.

We consider first, of course, the propriety of the trial court's action on defendants' motion for judgment. Little time need be spent on the cited and well-recognized rules that the evidence must be considered in a light favorable to plaintiff, and that the case may not be withdrawn from the jury unless there is no room for reasonable minds to differ on the issues, in the exercise of a fair and impartial judgment. De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628; Brandt v. Thompson, Mo., 252 S.W.2d 339; Hammontree v. Edison Bros. Stores, Mo.App., 270 S.W.2d 117; Dean v. Safeway Stores, Inc., Mo., 300 S.W.2d 431; Freeman v. Myron Green Cafeterias Co., Mo., 317 S.W.2d 303. On the other hand, a verdict may not rest in speculation and conjecture and it is plaintiff's burden to produce substantial evidence of negligence. Quinn v. St. Louis Public Service Co., Mo., 318 S.W.2d 316; Davidson v. Hennegin, Mo., 304 S.W.2d 836; Craddock v. Greenberg Mercantile, Inc., Mo., 297 S.W.2d 541; Snyder v. St. Louis Public Service Co., Mo., 329 S.W.2d 721. We note at this point that negligence entails the doing of something, or failing to do something, when, as a consequence thereof, the actor should have reasonably anticipated injury to another. Gladden v. Missouri Public Service Co., Mo., 277 S.W.2d 510; Stutte v. Brodtrick, Mo., 259 S.W.2d 820; Komeshak v. Missouri Petroleum Products Co., Mo.App., 314 S.W.2d 263; Lawson v. Higgins, 350 Mo. 1066, 169 S.W.2d 881; Dickinson v. Eden Theatre Co., 360 Mo. 941, 231 S.W.2d 609. Essentially, the question here is whether Dr. Hines, under all the existing circumstances, including plaintiff's mental condition, should reasonably have anticipated the probability that plaintiff would thus bolt for the door during the brief period when the doctor's back was turned and the door was closing, and should therefore have taken some other action.

We shall discuss briefly the more pertinent of the cases which have been cited, pro and con. In Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d 743, a patient who had previously attempted suicide was left unobserved for a period of at least half an hour; during this time she escaped from a "safety belt" and hung herself on a rope made from strips of her nightgowns; the time element was considered material, and it was apparent that she had been unobserved for a considerable period. In Smith v. Simpson, 221 Mo.App. 550, 288 S.W. 69, an acutely depressed patient with suicidal tendencies was left unobserved for successive periods of approximately two hours each during the night and early morning hours. During the last such period she hung herself with bed sheets from the easily accessible elbow of a steam pipe; one nurse was in attendance on the ward. In Bennett v. Punton Sanitarium Ass'n, 213 Mo.App. 363, 249 S.W. 666, a mental patient who had been very unruly at times was allowed to sleep on the fourth floor of a sanitarium, with only two or three other patients on that floor; the jury could have found that there was no nurse in attendance on the floor. There were gratings on the

windows, supposedly locked, but the patient escaped through a window and tried to slide down a rope fashioned of bed sheets, thus injuring himself. In each of these three cases the court held that a submissible issue of negligence was made. In each case the time element was highly material. All three suits were against sanitariums or physicians specializing in the care of the mentally ill.

In Paulen v. Shinnick, 291 Mich. 288, 289 N.W. 162, an acutely depressed woman patient, who had attempted suicide several times, was placed in a ward where the windows were covered with heavy screens; these opened inwardly, and were locked. Thus, the window could be raised and the screen locked. While the patients were sewing, plaintiff complained of feeling faint. Thereupon a nurse opened the screen and raised the window, but did not lock the screen again; the patient then complained that she had dropped her thimble under the radiator. While the nurse leaned over to hunt for it, with her back to the patient, the latter climbed on the radiator and jumped out of the open window. The court held that a jury question on negligence was presented, noting that plaintiff had been particularly depressed on that day. In Tate v. McCall Hospital, 57 Ga. App. 824, 196 S.E. 906, defendant permitted the patient's wife to stay with him in his room during the night to watch him, without furnishing an attendant. The patient was temporarily deranged and the wife was almost exhausted from caring for him and working at her job in a mill. The patient had twice attempted to leave his room, one attempt being successful. The wife dropped off to sleep and the patient went out of the window, injuring himself. A judgment of nonsuit was reversed, upon the theory that there was a known and independent duty to guard and protect the patient. In Fowler v. Norways Sanatorium, 112 Ind.App. 347, 42 N.E.2d 415, a depressed patient in a mental hospital, who had twice attempted suicide, was sent with one young attendant to a doctor's office in the city for X-rays. In this seventh floor office there were various rooms, and large, open windows. Certain X-rays had been taken and the patient was seated with the attendant seated nearby; he arose, pretended to stretch, then dashed into an adjoining room and jumped out an open window. Under these circumstances the court held that an issue of negligence was made. The seventh floor location and the open windows were circumstances deemed very material.

On the other side of the picture we note the following cases. In James v. Turner, 184 Tenn. 563, 201 S.W.2d 691, a highly nervous patient, who had threatened suicide, was admitted to a hospital specializing in the treatment of mental and nervous diseases. While out walking on the grounds, and after some slight improvement, he dashed away from his attendant, climbed the ladder of a water tower, jumped in and drowned himself. There was no previous warning. The court noted that strict restraints might have retarded his progress, and that the patient's actions here were not within "reasonable contemplation," but merely within the range of possibilities. Holding that no negligence was shown, the judgment for plaintiff was reversed. In Torrey v. Riverside Sanitarium, 163 Wis. 71, 157 N.W. 552, a patient with "obsessions" was being transferred from an open to a guarded ward; he had walked off the night before, and had spent some hours in the city. An attendant was with him, and he was only partially dressed. Suddenly he bolted away, ran down the steps, jumped out a window, and ran to a house nearby, demanding clothing and the use of a telephone. The suit was instituted by that neighbor woman for her fright. The court found no submissible negligence, noting that there had been no violence exhibited, that greater restrictions might have been harmful, and that "omniscience" in treatment cannot be demanded. It stated that defendant's employees were performing a difficult task with all the care and caution which ordinarily prudent persons

would deem necessary. In Illinois Central R. R. Co. v. Cash's Adm'x, 221 Ky. 655, 299 S.W. 590, a delirious and violent patient in an ordinary hospital released himself from a "restraining sheet," suddenly jumped out of bed and frightened his nurse, and then jumped out of the window. It was held that such acts and consequences could not have been reasonably anticipated, that deceased's acts were unusual and extraordinary, and that a submissible case was not made. While the precise degree of care required of such a hospital may differ from that required in our case, the declared principles are fully applicable. And see, generally, to like effect, Mesedahl v. St. Luke's Hospital Ass'n, 194 Minn. 198, 259 N.W. 819. There is also much in the opinion in Root v. State, 180 Misc. 205, 40 N.Y.S.2d 576, 577, which is applicable in principle here. There recovery was denied. It was said there, in part: "The degree of care owing (by the state) to its inmates may be more exacting because they are wards of the State * * * the State, nevertheless, is not an insurer of the safety of the inmates of its institutions. * * * Negligence does not exist unless there is a reasonable likelihood of danger as a consequence of the act complained of. * * * Failure to guard against a remote possibility of accident * * * does not constitute negligence." Wording in parenthesis is inserted. And see Kubas v. State, 198 Misc. 130, 96 N.Y.S.2d 408.

In Davis v. Springfield Hospital, Mo. App., there are two opinions following separate trials, these appearing at 196 S.W. 104 and 204 Mo.App. 626, 218 S.W. 696. The deceased was a patient in a general hospital. He was sick and delirious; he had been found wandering in the hall several times, and also doing peculiar and irrational things otherwise. The ruling was that the hospital would not be liable if he jumped out of the window, because it could not reasonably anticipate that such a thing was "likely to happen"; that, however, a submissible case was made on the theory of negligence in permitting him to wander through the hall and out on a fire escape through an easily accessible door, if in fact the jury found that he was injured in that way. The court said, 218 S.W. loc. cit. 699: "The law only requires reasonable care—that care to avert dangers which a reasonable man would take under the circumstances as they exist—and no man does or is required to take measures to avert a danger which the circumstances as known to him do not suggest as reasonably likely to happen."

Here defendants were specialists and they knew plaintiff's condition; there is no controversy about that. They knew that he had improved somewhat but that there was still a "potential" for escape or suicide. We are by no means convinced here that plaintiff was actually attempting to commit suicide as the parties seem to assume; an attempt to escape seems more probable, but that is more or less irrelevant. There was no substantial evidence to sustain the submission that Dr. Hines failed to make "a reasonably careful inspection of the area * * *." He looked in three directions, saw the plaintiff in his room, and was conscious of his presence and location. True, there was a notation on the record of the "usual quick glance," but the doctor explained that "we don't stand there and stare," and that he took a thorough look. There is and could be no evidence to the contrary; and the fact remains that he did see plaintiff in his room and he considered plaintiff's presence. The manner of looking thereby became immaterial. The evidence supposedly indicating the doctor's hurrying and being tired is not substantial evidence, in view of the full explanation of all the circumstances. There is nothing to show that any such elements played a part. Actually, what plaintiff fixes upon as negligence is the manner in which the doctor went through the door and attempted to close it. He had to unlock it and he had to go through it. He continued to watch plaintiff, even as he unlocked the door. He chose to step through quickly, place his shoulder (presumably the left)

against the door to hurry its automatic closing, and started at the same time to turn so that he could again see plaintiff. Momentarily his back was turned to plaintiff, and before he fully completed his reverse turn, plaintiff struck the door. One might now suggest other ways in which the doctor could have gone through the door. He might have backed out; he might have made a complete turn to his right as he went through and pushed on the door; or he might simply have stepped through and let the door close itself. These methods might have taken longer, and it would be purely speculative to say what would have happened if one of them had been adopted. Plaintiff ran or leaped approximately 15 feet; it would seem that he had started, or was fully prepared, before he could see that the doctor's back was turned. The method used by the doctor would undoubtedly close and lock the door as quickly, if not more quickly, than any other. The period when the doctor was unable to watch plaintiff was probably not over a second or two, at most. To have stood and watched plaintiff longer while at the door, or to have talked again with him, might well have disturbed him unduly and have created a desire to escape, if one was not already present. A physician must necessarily be allowed a wide range of discretion and judgment. So say the cases.

■ The confinement of plaintiff was not defendants' sole duty; they were required to treat him, to cure him if possible, and to guard and protect him in so far as was reasonably possible consistent with their other duties. They could easily have put him in a straight jacket or kept him strictly confined, if his safety was the only object. See Kubas v. State, 96 N.Y.S.2d 408. Giving him the freedom of this ward was a "calculated risk," assumed in the light of the modern concepts of treatment. The ultimate question here is whether under all the existing circumstances, Dr. Hines was reasonably required to anticipate that plaintiff was likely to make such a precipitous bolt for the door as he was passing through it, and to adopt some other procedure in his exit. We have determined that he was not, and that there was no substantial evidence of negligence on his part. We are dealing with reasonable probabilities, not mere possibilities. This case, involving as it does a claim of negligence based on an act performed in almost "split second" timing, is vastly different from the Missouri cases where patients were left unguarded for relatively long periods, as Stallman, Smith and Bennett. The outstate cases, while helpful in principle, rest on widely varying facts and are not strongly persuasive. To hold that a fair inference of negligence might be drawn from this evidence would, in our opinion, impose an unrealistic degree of care and make defendants insurers of plaintiff's safety and well-being, for all practical purposes.

The trial court correctly set aside the verdict and judgment and entered judgment for defendants. In view of this ruling, no other points need be considered.

The judgment will be and is affirmed.

All concur, except STORCKMAN, J., who dissents in separate opinion filed.

STORCKMAN, Judge (dissenting).

I cannot concur in the opinion's holding that a verdict for the defendants should have been directed. Admittedly, the question is a close one but, as I view the evidence, inferences of negligence might reasonably be drawn from it. In such case, the question should be submitted to the jury for its determination.

The defendants were trained in the ways and impulses of the mentally ill. They knew that the plaintiff in his condition might undertake to commit suicide. They knew that the plaintiff wanted to leave the hospital and go home and that he was disappointed when told he could not do so. It follows that the defendants were charged with knowledge that the plaintiff in his

mental condition and having the desire to go home might attempt to escape from the ward in the hospital. Whether he was intent on suicide or merely wanted to go home, the defendants knew that he was likely to injure himself in his attempt to get away or after he got outside. While the patients were not confined to their room, the ward doors were kept locked and, unlike some of the cases cited, it was not a part of the therapy to let these patients out-of-doors.

It is in this background of knowledge that we must determine if the defendant doctor used due care. 11 A.L.R.2d 751, 782–783. Was it due care to use the exit opposite the plaintiff's room and in full view of the patient under these circumstances? It seems to me that it could reasonably be said that the doctor should not have exposed the patient to this temptation to escape; he should have used the elevator instead. If for any reason the doctor could not use the elevator but had to leave through the door, he could have directed an attendant to be with the patient on some pretext while the doctor was leaving.

But putting that aside, I further think that reasonable minds might vary as to whether the doctor used due care in the manner in which he went through and attempted to close the door.

By his own testimony, the doctor knew that the patient was in full view of the door about fifteen feet away. The patient was disappointed that he could not leave the hospital and here was the invitation of a door being opened. Turning his back on the patient even briefly was a further invitation. The doctor knew that the patient, about fifteen feet away, could be at the door in two or three bounds. The care required must be commensurate with the risk of danger presented.

One of the decisive evidenitary facts is that the doctor turned his back and did not look at the patient again after he unlocked the door and passed through, al-though the glass panels in the door permitted this to be done.

The doctor testified that he placed his back or shoulder against the door. To me this seems to be an unusual, awkward and time-consuming way of getting through and closing the door. The normal and certainly the preferred way in this situation would have been for the doctor to unlock and push the door open with one hand, step through and turn quickly and, as he withdrew his key, start to push the door shut with his other hand and then use both hands. Not only would this appear to be a quicker way of getting through the door, but it would also have the advantage that the doctor would be facing the patient for all but a brief instant. The fact that the doctor's back was turned and continued to be turned would further tend to encourage the patient to bolt through the door. Facing the patient would discourage the attempt as well as put the doctor on notice and prepare him to resist the attempt to escape.

The jury did not have to believe that the reason the doctor used his back or shoulder in closing the door was because the door with its automatic closer could be shut faster by that means. An automatic closer that could not be forced as quickly by facing the door and pushing with the hands would certainly be out of adjustment. The jury might very well disbelieve that part of the doctor's testimony and conclude that he had taken his mind off of the patient and was using his hands to put away his keys or was preoccupied with something else.

Also a jury might reasonably find that the doctor did not observe his patient as carefully as he thought he did before he unlocked the door as well as that he delayed unduly in passing through the exit and closing the door. Having in mind the doctor's expert knowledge, the circumstances convince me that a jury could reasonably find the doctor negligent in one of these respects. There may be other reasons for submitting the case but to me these are sufficient. Therefore I dissent.