**Michael VELDER, Respondent,**

v.

**CORNERSTONE NATIONAL INSURANCE COMPANY,**
Respondent,

and

**Petty Insurance Agency and Caleb Petty, Appellants.**

No. WD 67198.

Missouri Court of Appeals, Western District.

Jan. 22, 2008.

Mark Murphy, Liberty, MO, for respondent Velder.

James E. Godfrey, St. Louis, MO, for respondent Cornerstone Insurance.

Donald W. Petty, Liberty, MO, for appellant.

Before HOWARD, C.J., and BRECKENRIDGE and ELLIS, JJ.[1]

---

1. Breckenridge, J., was a member of this court at the time the case was argued and submitted. She was subsequently appointed a judge of the Supreme Court of Missouri but has been reassigned to this court as a special judge for the purpose of disposition of this case.

VICTOR C. HOWARD, Chief Judge.

Defendants Caleb Petty and Petty Insurance Agency, Inc. (together, Petty), appeal an adverse judgment in which they were jointly held liable for fraudulent misrepresentation to plaintiff Michael Velder. Petty was also forced to indemnify Cornerstone National Insurance Company (Cornerstone) for its liability for the same fraudulent misrepresentation. Petty, as an insurance agent for Cornerstone, insured several of Velder's automobiles. Velder purchased a replacement vehicle and notified Petty. Petty told Velder that the new vehicle would be covered; however, Petty failed to notify Cornerstone of the substitution, and Cornerstone denied coverage. On appeal, Petty now claims that the trial court erred in entering both judgments. He argues that the false representation portion of the judgment was erroneous because Velder was actually covered by the insurance policy, and Cornerstone's judgment was inappropriate because Petty's wrongdoing did not cause damage to Cornerstone. For the reasons stated below, we reverse the judgment of the trial court.

**Facts and Background**

Caleb Petty, owner of Petty Insurance Agency, Inc., operated as an independent insurance agent for Cornerstone, among other insurance providers. Cornerstone is an automobile insurance carrier that markets its insurance products through independent agents. A written contract defined the nature of the relationship between Cornerstone and Petty. The contract required, among other things, that the agent keep and maintain a license and promptly notify Cornerstone of any additional liability incurred by Cornerstone.

Starting in 2001, Petty provided a Cornerstone insurance policy covering four vehicles, which included liability, bodily injury and property damage, and collision coverage to Velder. Pursuant to this policy, collision coverage would extend to replacement vehicles if the insured met certain conditions. At trial, Cornerstone admitted that, generally, when an insured acquires a new vehicle, the insured notifies the agent, who in turn contacts Cornerstone, for the notice under the newly acquired auto clause to come into effect.

In September of 2003, Velder notified Petty that he intended to trade his insured Isuzu Trooper for a 2003 Ford Escort. Before the delivery of the new Ford, Velder contacted Petty and informed him that he was purchasing the Escort and would no longer need insurance on the Trooper. Velder called Petty after delivery, which occurred on September 27, 2003, so that he could verify that the new vehicle was insured. Petty informed Velder that the Escort would be insured when he drove it off the lot and would continue to be covered if Velder called back with the Escort's vehicle identification number and other essential information. Velder provided the information, and Petty again assured Velder that the Escort was fully insured. On October 27, 2003, while driving the Escort, Velder's daughter was stopped by a police officer, and was ticketed for her inability to produce proof of insurance. Petty again assured Velder that the car was insured and stated that written verification would be forthcoming. Velder soon thereafter received an insurance card with the effective date of October 2, 2003.

On December 31, 2003, the Escort was involved in an accident and was so severely damaged that it was considered a total loss. Cornerstone refused to pay Velder under the policy's collision coverage, claiming that Velder's policy did not cover the Escort because Petty did not forward a change order to Cornerstone indicating

that the Escort would be substituted for the Trooper. While disputed at trial, Petty insisted that he did forward appropriate notice to Cornerstone. Moreover, in violation of section 375.014,[2] in July of 2003, Petty's license to sell insurance expired and was not renewed.

Velder sued both Petty and Cornerstone alleging fraudulent misrepresentation. The jury found the defendants jointly liable for $19,343.00.[3] Co-defendant, Cornerstone sought indemnification from Petty on the claim.[4] In a cross-claim, Cornerstone claimed that Petty breached the agency agreement because Petty subjected Cornerstone to liability without acquiring Cornerstone's written consent, failed to maintain an insurance seller's license, and solicited insurance without a license.[5] Each of these actions violated explicit clauses in the contract between Cornerstone and Petty. The cross-claim was court tried. The trial court found Cornerstone had a right to full and complete indemnification on the fraudulent misrepresentation claim.

Petty now appeals, claiming the court erred in failing to direct a verdict for him on the misrepresentation claim and entering judgment for Cornerstone on its indemnification claim. Cornerstone does not appeal.

## Standard of Review

 Construction of an insurance contract is question of law which we review *de novo*. *Green v. Federated Mut. Ins. Co.*, 13 S.W.3d 647, 648 (Mo.App. E.D. 1999). "Because the parties generally agree on all relevant facts,[6] our analysis is essentially one of interpretation of the insurance contract. The meaning of an insurance contract is a question of law, particularly in reference to the question of coverage. If only a legal issue is at stake, this court reviews the trial court's judgment *de novo.*" *H.K. Porter Co. v. Transit Cas. Co.*, 215 S.W.3d 134, 140–41 (Mo.App. W.D.2006) (internal citation omitted).

 In the current appeal, we review both Petty's denied motion for a directed verdict and a court-tried judgment for indemnification. "On appeal of the denial of a motion for a directed verdict, we review evidence and reasonable inferences therefrom in the light most favorable to jury's verdict and disregard evidence to the contrary." *Gorman v. Wal–Mart Stores, Inc.*, 19 S.W.3d 725, 732 (Mo.App. W.D.2000). A "case may not be withdrawn from the jury unless there is no room for reasonable minds to differ[.]" *Gregory v. Robinson*, 338 S.W.2d 88, 91 (Mo. banc 1960). Furthermore, when reviewing court-tried issues, we apply the standard of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

2. All citation to statutes refers to RSMo 2000 and all citation to Rules refers to Missouri Supreme Court Rules (2007) unless otherwise indicated.

3. Velder sought $16,765 in damages for the value of his car, 9% prejudgment interest, as well as a $3,350 statutory penalty, attorney's fees, and court costs. The record is unclear as to how the jury arrived at the total of $19,343.00.

4. The jury found Cornerstone vicariously liable for Petty's tort of fraudulent misrepresentation.

5. Petty also unsuccessfully sought indemnification from Cornerstone for any amounts it was found liable to Velder; however, Petty does not appeal an adverse judgment on this claim.

6. While Petty disputed at trial whether he actually submitted a change order to Cornerstone, he assumes for the purpose of the claims brought on this appeal that no change order was submitted.

"The trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law." *Crockett v. Polen,* 225 S.W.3d 419, 419–20 (Mo. banc 2007).

### Fraudulent Misrepresentation

■■■ Essentially, Petty's first point centers on an argument that Velder's Escort was actually covered by the insurance policy and that as a result there was no misrepresentation to Velder because his statement that the Escort was covered was not false. Velder complained that Petty fraudulently misrepresented a material fact by repeatedly assuring him that the Escort was insured when, in fact, it was not. To state a claim for fraudulent misrepresentation the plaintiff must prove:

> a representation; that is false; that is material; the speaker's knowledge of its falsity or ignorance of its truth; the speaker's intent it be acted on; the hearer's ignorance of the falsity of the representation; the hearer's reliance; the hearer's right to rely on it; and injury.

*State ex rel. PaineWebber, Inc. v. Voorhees,* 891 S.W.2d 126, 128 (Mo. banc 1995). "The truth or falsity of the representation is determined as of the time it was made and as of the time it was intended to be relied and acted upon." *Botanicals on the Park Inc. v. Microcode Corp.,* 7 S.W.3d 465, 468 (Mo.App.E.D.1999). Here, the material misrepresentation alleged is that Petty assured Velder that the Escort was insured. If, in fact, the Escort was insured, Velder had no cause of action for misrepresentation. On appeal, Petty claims that the trial court erred in holding

that the vehicle was not insured and in failing to direct a verdict for him.

■■■ When interpreting insurance policies, "we read the contract as a whole to determine the parties' intent. We give effect to that intent by enforcing the contract as written according to the plain and ordinary meaning of the contract's language[.]" *Barron v. Shelter Mut. Ins. Co.,* 230 S.W.3d 649, 651–52 (Mo.App. W.D. 2007). "[W]hen an insurance contract can be interpreted in two equally reasonable ways, we must construe the insurance contract against the drafter." *Id.* at 653.

The insurance policy, covering Velder's vehicles prior to his purchase of the Escort, provided that newly acquired vehicles would be covered in certain circumstances. The policy stated:

> Collision Coverage for a newly acquired auto begins on the date you become the owner if the Declarations indicate that Collision Coverage applies to at least one auto. In this case, *the newly acquired auto will have the broadest coverage we now provide for any auto* shown in the Declarations. However, for this coverage to apply, *you must ask us to insure the newly acquired auto within 30 days after you become owner.*

(Emphasis added.) Under the policy, if Velder asked the company to insure the new vehicle within 30 days of purchasing it, it was automatically covered under the existing policy.[7]

■■■ The question now before us is whether a reasonable juror, properly instructed on the operative law, could have concluded that Velder's notification to Petty was insufficient to bring the Escort under the policy.[8] Velder argues that

---

7. Under the policy, the term "us" is defined as "the Company providing this insurance."

"You" is defined as "[t]he named insured shown in the Declarations," namely, Velder.

8. Overwhelming and uncontroverted evidence

there was sufficient evidence to deny Petty's motion for a directed verdict because a representative of Cornerstone, Robert Trask, a senior underwriter, testified that there was no collision coverage. He testified that it was Cornerstone's position that Velder's Escort was not covered. When asked why Cornerstone denied the insurance claim, he explained:

A. We were not notified. I think we've discussed this or it's been discussed quite a bit today.

Q. It has. You didn't receive a timely notification from the insurance agent?

A. The first request we had was after the first of the year.

. . . .

Q. So had you received any timely change order from Caleb Petty or Petty Insurance Agency on or about September 27th, Mr. Velder's claim as of December 31st, 2003, would have been paid?

A. That is correct

Q. Okay.

A. And if—there was really no underwriting decision to be made on an existing policy. If they change a vehicle, we change it.

It is the position of Cornerstone and Velder that there was no coverage under the policy because Cornerstone was not actually notified within the prescribed period that Velder had purchased a new car.

Cornerstone's position, as expressed by their senior underwriter at trial, is not fatal to Petty's assertion that Velder's Escort was covered by the policy. The issue is appropriately before this court and is a question of law; therefore, we need give no deference to the trial court. "The meaning of an insurance contract is a question of law, particularly in reference to the question of coverage. If only a legal issue is at stake, this court reviews the trial court's judgment *de novo*." *H.K. Porter Co.*, 215 S.W.3d at 140–41 (internal citation omitted).

The policy charged Velder with a single task as a prerequisite for insuring the new vehicle-namely, notifying the company. The record clearly demonstrates that Velder completed this task. Even assuming as true the disputed fact that Petty did not forward the change order, the Missouri Supreme Court has held, when interpreting a nearly identical insurance contract, that notice supplied to the agent is sufficient to trigger the newly acquired vehicle clause. *Hall v. Weston*, 323 S.W.2d 673, 677–78 (Mo.1959). In *Hall*, an insured motorist notified his insurance agent by telephone that he had replaced an older tractor-trailer with a newer tractor-trailer; however, the insurance agent neglected to forward the notice to the insurance company. *Id.* at 677. The policy there provided that coverage would extend to "an automobile, ownership of which is acquired by the named insured, owner of the described automobile if he notified company within 30 days following its delivery date." *Id.* at 675. The tractor-trailer was then involved in an accident producing substantial loss. *Id.* at 674. The *Hall* court found the new tractor-trailer was insured. The court reasoned:

leads us to the conclusion that Velder did in fact inform Petty that he had traded the insured Trooper for the new Escort within thirty days after he became the owner. Even Cornerstone's senior underwriter noted that Velder supplied Petty with sufficient notification of the substitution. Moreover, even the court made a specific finding of fact that Velder contacted Petty for purposes of replacing a vehicle on his policy. No reasonable juror could have concluded that Velder did not inform Petty that he had purchased the Escort.

[t]he "company" wrote the policy. It easily could have specified how and where and in what manner and by what method an insured was to notify the "company within 30 days following" the delivery of a "newly acquired automobile." Insured did not do so. It chose to provide only that insured was to notify the "company." The most reasonable construction of that broad, general language, and it seems a compelled construction if the policy is construed favorably to insured, is that any notice reasonably calculated to reach insurer would comply with that notice requirement.

*Id.* at 678. It concluded that the notice by telephone to the insurance agent constituted "notice reasonably calculated to reach insurer." *Id.*

The reasoning of *Hall* and its interpretation of the contract applies equally well in the current case. The newly acquired Escort became insured when Velder notified Petty that he had acquired the new car. The insurance contract provided that for the new vehicle to be insured Velder was required to notify Cornerstone and *Hall* informs us that Velder was permitted to do that in any way reasonably calculated to reach Cornerstone. In the current situation, the facts clearly demonstrate that notification by telephone to Petty complied with the policy. Petty served as the primary link of communication between Cornerstone and Velder. Moreover, both Petty and Cornerstone's senior underwriter indicated that the typical procedure would be for the insured to notify the agent, not Cornerstone directly, when seeking replacement vehicle coverage. Velder's Escort was, therefore, covered under the policy. Consequently, because the Escort was in fact covered, Velder's claim for fraudulent misrepresentation against Petty was unsupportable because Petty's statement that Velder was insured was not false.

Furthermore, the fact that Petty breached his contract by not filing a change order with Cornerstone or maintaining a license to sell insurance does not affect the insurance contract between Cornerstone and Velder. The insurance contract provided a means of extending insurance to a newly acquired vehicle. That section was triggered. Under the circumstances of this case, any fault in the processing of that change order does not affect the insurance policy between Cornerstone and Velder.

We, therefore, reverse the judgment against Petty for fraudulent misrepresentation.

### Cornerstone's Indemnification

Next, we examine Cornerstone's indemnification judgment against Petty.[9] Cornerstone was held vicariously

9. The remainder of the case would have been greatly simplified had Cornerstone appealed Petty's judgment against it for fraudulent misrepresentation through its agent. This court is only permitted to reverse those judgments that have been appealed, and we examine only the claims raised in the notice of appeal. *See Volume Servs., Inc. v. C.F. Murphy & Assocs., Inc.,* 656 S.W.2d 785, 791 n. 2 (Mo. App. W.D.1983) (stating, "[a]lthough none of the parties has raised the issue of whether plaintiff's appeal is taken from a final, appealable judgment and is, therefore, timely, the first duty of an appellate court is to determine this issue, *sua sponte* if necessary. Absent a final judgment and timely notice of appeal, we are without appellate jurisdiction."). *See also* § 512.050 (stating that a party's "appeal shall [not] be effective unless the notice of appeal shall be filed not later than ten days after the judgment or order appealed from becomes final"). Therefore, even though the fraudulent misrepresentation claim against Cornerstone and Petty was based on the same purported misrepresentation, the claim as to

liable for Petty's supposed fraudulent misrepresentation. Cornerstone charged that the negligent acts of Petty, in failing to obtain Cornerstone's written consent prior to Cornerstone assuming additional liability and in failing to maintain insurance, created a cause for indemnification for the fraudulent misrepresentation judgment. Velder acquired a judgment against Cornerstone for Petty's wrongdoing with a theory of vicarious liability through an agent.

> "[T]he agent who subjects his principal to liability because of a negligent or other wrongful act is himself subject to liability to the principal for the loss, which results therefrom. This includes the payment of damages by the principal to the third person.... Thus, a servant who, while acting within the scope of employment, negligently injures a third person, although personally liable to such person, is also subject to liability to the principal if the principal is thereby required to pay damages."

*State ex rel. Algiere v. Russell,* 359 Mo. 800, 223 S.W.2d 481, 483 (1949) (quoting RESTATEMENT OF AGENCY § 401 cmt. c). Petty now claims that even if he was negligent or violated his contract with Cornerstone, those acts were not the cause of any damage to Cornerstone. He claims that because the policy covered Velder's Escort, the wrongful conduct caused no harm to Cornerstone. At its core, the claim reduces to an argument that whatever Petty's wrongdoing was, whether sounding in contract or negligence, it was not the cause of damages. We agree with Petty. Petty's wrongdoing either occurred after the

time the insurance became effective or did not affect Cornerstone's liability.

Closer analysis of the wrongdoing actually alleged by Cornerstone supports this conclusion. None of the wrongdoing alleged caused Cornerstone to become liable for fraudulent misrepresentation. Both Missouri law and the contract between Petty and Cornerstone required that all insurance agents maintain an insurance license. *See* § 375.014. However, Cornerstone points to no statute that makes an agent who acts without a license personally liable for any insurance claims arising from insurance issued while unlicensed. Cornerstone has not demonstrated that Petty's expired insurance license caused damages. Nor does the contract provide any liquidated damages for failing to maintain a license. The record is unclear why Cornerstone insists that Petty's failure to keep a license caused Cornerstone damages.

Second, Petty's wrongdoing in failing to promptly notify Cornerstone after receiving a request from Velder did not cause Cornerstone to suffer any greater liability insofar as it relates to a claim for indemnification for false misrepresentation. The coverage of the newly acquired vehicle was automatic; Cornerstone had no discretion to deny or lessen its liability once the insured notified the agent that Velder purchased the new vehicle. These were the terms of the policy. As Cornerstone testified, no underwriting decision is made at the time of a submitted change order.[10] Therefore, even if Petty was negligent or breached his contract with Cornerstone in failing to notify Cornerstone, such malfeasance did not affect Cornerstone's liability

---

Petty will be reversed because he appealed and the claim as to Cornerstone will stand.

**10.** Even if Cornerstone claimed that Petty's failure to notify Cornerstone did not provide Cornerstone with opportunity to adjust Veld-

er's premiums, the only damage would be a difference in premium. Here, there was no evidence that these premiums would have increased when insuring the Escort.

under the insurance policy. The Escort was already insured when the alleged wrongdoing occurred.

The current case is similar to *Fidelity & Casualty Company of New York v. Arcadia Valley Realty & Insurance Agency, Inc.*, 636 S.W.2d 388 (Mo.App. E.D.1982). In *Fidelity*, a general agent for an insurance company, issued homeowners insurance policy. *Id.* at 389. The policy was effective for one year. *Id.* At the end of the year, the insured contacted the agent and requested that the policy be renewed for another year, however, the agent neglected to inform the insurance company that the policy would be renewed. *Id.* Fire then destroyed the home. *Id.* The insurance company paid the claim and brought a negligence suit against the agent for failing to forward the renewal notice to the insurance company. *Id.* at 390. The court noted that the agent had authority to bind the insurance company through its general agency contract and that the insured actually maintained his insurance even though the insurance company was not notified. *Id.* Reasoning that it is the plaintiff's burden to demonstrate that negligence caused damage, the court found "there is no evidence that [the insurance company] would have refused to accept the risk or cancelled the policy had it been informed by [the agent] of the issuance." *Id.* Our case is similar. Cornerstone covered Velder's Escort under the replacement vehicle clause. The fact that its agent did not inform it of the new coverage does not generate damages. In both cases, the agent's failure to notify the insurance company of the new coverage after learning of such, even if patent misfeasance, is not the cause of damages.

Cornerstone argues that *Fidelity* is distinguishable. In *Fidelity*, the insurance company was insuring an identical risk both before and after the renewal; however, in our case Cornerstone was insuring a risk different from the risk insured before Petty's wrongdoing. Cornerstone argues that had it been notified of the trade, from a used Isuzu Trooper to a new Ford Escort, it could have canceled the policy or charged additional premiums. Such may have been the case; however, no evidence was presented that supports such a proposition. Cornerstone continued to collect premiums from Velder, and there was no evidence as to whether those premiums would have been raised or lowered if Cornerstone had been notified. Any additional underwriting decision was not made until sometime after vehicle replacement. While it may have theoretically damaged Cornerstone in that it was unable to collect the proper premiums from Velder or properly assess its own risk and plan for the possible casualty of the new car, these claims are not before the court. We now review only the indemnification for fraudulent misrepresentation claim, and on that claim Cornerstone has not met its burden in demonstrating that any wrongdoing on the part of Petty caused Cornerstone damages.

Cornerstone insists that *Parshall v. Buetzer*, 195 S.W.3d 515 (Mo.App. W.D. 2006), provides support for its position. In that case, Parshall sought windstorm insurance for his concrete plant. *Id.* at 517. The agent, Buetzer, told Parshall that he was covered from the moment of the conversation. *Id.* A month later, a windstorm destroyed the concrete plant. *Id.* at 518. The insurance company denied Parshall's claim, explaining that Buetzer did not file for the insurance. *Id.* We held that the agent, not the insurance company, was liable for the windstorm damage because Buetzer had no apparent or actual authority to bind the insurance company. *Id.* at 520–21. Moreover, the written agreement between Buetzer and the insurance company only gave him power to bind the compa-

ny without consent for three days. *Id.* at 518. Furthermore, Buetzer provided no other evidence that the insurance company acted in some way to indicate to Parshall that Buetzer could bind the insurance company. *Id.* at 520.

*Parshall,* however, is entirely irrelevant to Petty's second point. *Parshall* does not analyze indemnification; its central concern is that of agency liability. In *Parshall,* the insurance company was not liable to the insured for any amount. There was no agency between the insured and the agent nor a contract between the insurance company and the insured, which informed the insured that he could extend his coverage by contacting the agent. There, the agent's liability occurred because he actually was negligent in representing to the insured that his property was covered. The insurer had nothing to do with and had no liability for the transaction. Such is not the case here. Here, Cornerstone sought and received indemnification for the acts of its agent. We reversed that judgment and found that the agent was not liable for fraudulent misrepresentation. (See above.) We only allow Velder's vicarious fraudulent misrepresentation judgment against Cornerstone to stand because it was not appealed. Nevertheless, we cannot permit Cornerstone's indemnification to stand against Petty. His actions, while improper, did not cause the judgment against Cornerstone.

## Conclusion

We reverse both judgments against Petty. The unappealed judgment against Cornerstone remains.

BRECKENRIDGE and ELLIS, JJ., concur.